■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JON PAUL LAZARTES, Appellant. [805 NYS2d 558]—

Appeal by the defendant from a judgment of the Supreme Court, Kings County (Gary, J.), rendered July 31, 2001, convicting him of murder in the second degree (two counts), assault in the first degree, assault in the second degree (two counts), reckless driving, and driving without a license, upon a jury verdict, and imposing sentence.

Ordered that the judgment is modified, on the law, by (1) reversing the convictions of murder in the second degree (two counts) and assault in the first degree, vacating the sentences imposed thereon, and dismissing those counts of the indictment, and (2) reversing the convictions of assault in the second degree (two counts), vacating the sentences imposed thereon; as so modified, the judgment is affirmed, and the matter is remit-

ted to the Supreme Court, Kings County, for a new trial on the remaining counts of the indictment.

The defendant appeals from a judgment convicting him of two counts of murder in the second degree, assault in the first degree, two counts of assault in the second degree, reckless driving, and driving without a license. He is currently serving concurrent sentences, the maximum of which is 20 years' to life imprisonment. The charges arise from a tragic automobile accident that occurred in the early morning hours of January 16, 2000, which resulted in the death of two people.

At the time of the accident, the defendant was 21 years old with an unblemished record. On the night in question he was visiting his family in New York and, accompanied by several friends, took the family car, a 1995 champagne-colored Mercedes-Benz, to a club in the Bensonhurst section of Brooklyn. The evidence adduced at trial, including the results of medical tests administered at the hospital, established that during his time at the club the defendant neither drank alcohol nor ingested drugs. The defendant and his friends left the club at 3:30 A.M. The defendant contended that while traveling on the Belt Parkway he was cut off by a burgundy-colored Mercedes-Benz. He swerved to avoid hitting the other Mercedes and instead collided with a Honda in which the decedents were passengers.

Kalliopi Zahardiadis testified that she was driving the Honda with three of her friends to various locations. After eating some food, she did not feel well, so she turned over the driving to her friend Michael Mateo, who at the time did not have a valid driver's license. The Honda was low on gasoline and, upon entering the Belt Parkway, Zahardiadis and her friends decided to get gasoline from a service station located in the median divide of the parkway. As the Honda proceeded to the gas station it was hit by the defendant's vehicle. The People produced witnesses who described the defendant's car as playing "cat and mouse" with the burgundy Mercedes with both cars greatly exceeding the speed limit. However, these witnesses testified that the defendant's car slowed when traffic conditions so warranted.

The evidence regarding the speed at which the defendant's car was traveling varied greatly. Although most of the witnesses estimated the speed of the defendant's vehicle at between 85 and 95 miles per hour, the People produced a forensic expert who opined that, just before the accident, the defendant was traveling between 98 and 108 miles per hour and the most likely speed of the defendant's vehicle at the time of collision with the Honda was about 102 miles per hour, an estimate which he

acknowledged was dependent in part in assigning a speed of only 40 miles per hour to the Honda. The People's expert conceded that if the Honda was going faster, his estimate of the defendant's speed would drop to about 90-95 miles per hour. He further observed that the more weight present in the defendant's Mercedes, the slower the speed to be assigned to it. The expert further conceded that he based his calculations solely on the factory weight of the car and did not add the weight of gasoline, passengers, or cargo.

During trial, over the defendant's objection, the Supreme Court limited the use of information obtained from the medical records that Mateo, the driver of the Honda, had significant traces of cocaine and marijuana in his blood. The Supreme Court instructed the jury that it could utilize such information only in weighing the credibility of Mateo, who testified at trial. The defense was not permitted to explore Mateo's drug use as a possible validation of the defendant's version of the how the accident occurred, that it was due to Mateo's erratic driving. The Supreme Court then instructed the jury that the negligence of other drivers is generally a foreseeable circumstance, and constitutes an extraordinary, unforeseeable circumstance only if it is the sole cause of the injury or death. Thus, the court charged the jury that it should acquit the defendant if Mateo's erratic driving was the sole cause of the accident, but that Mateo's driving would not relieve the defendant of culpability if it was merely a contributing factor in the happening of the collision.

Generally a jury's verdict must be sustained as supported by legally sufficient evidence if "there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial" (*People v Bleakley*, 69 NY2d 490, 495 [1987]). In this case, the People failed to present legally sufficient evidence establishing the defendant's guilt of murder in the second degree and assault in the first degree. Although the defendant's attorney did not preserve for appellate review the precise issue of the sufficiency of the evidence with respect to the element of depraved indifference to human life by specifying that issue in his motion for a trial order of dismissal, we nonetheless reach the issue in the interest of justice (*see* CPL 470.15 [6]).

In order to sustain a conviction for depraved indifference murder, based upon legally sufficient evidence, the evidence, when viewed in the light most favorable to the prosecution, must establish that the defendant: "under circumstances evincing a depraved indifference to human life, . . . recklessly engaged in conduct creating a grave risk of death to another

person, and thereby caused the death of another person (Penal Law § 125.25 [2]). Reckless conduct requires awareness and conscious disregard of a substantial and unjustifiable risk that such result will occur or that such circumstance exists (Penal Law § 15.05 [3]). 'The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation' (*id.*). To constitute "depraved indifference," conduct must be " 'so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes the death of another' (*People v Fenner*, 61 NY2d 971, 973; *see also People v Register*, 60 NY2d 270, *cert denied* 466 US 953)" (*People v Russell*, 91 NY2d 280, 287-288 [1998]). In applying that standard, our courts have repeatedly adhered to the observation of the Court of Appeals in *People v Poplis* (30 NY2d 85, 88 [1972]), that the burden is upon the People to prove something more than merely reckless conduct, particularly where, as here, death results from a motor vehicle accident. In *People v France* (57 AD2d 432 [1977]), the Appellate Division, First Department, citing *People v Poplis* (*supra*), observed as follows:

" '*But the murder prescription requires more than recklessly causing death which could happen, for example, from gross carelessness in motor vehicle operation.* (Emphasis added.) The murder definition requires conduct with "depraved indifference" to "human life," plus recklessness. This is conduct of graver culpability, and it is the kind which has been rather well understood at common law to involve something more serious than mere recklessness alone which has had an incidental tragic result' " (*People v France, supra* at 434-435, quoting *People v Poplis, supra* at 88).

"Such condemned behavior is required to be extremely dangerous and fatal conduct performed without specific homicidal intent but with a depraved kind of wantonness: for example, shooting into a crowd, placing a time bomb in a public place, or opening the door of the lions' cage in the zoo . . . and not merely carelessness or recklessness in the operation of an automobile" (*People v France, supra* at 435 [internal quotations and citations omitted]).

Giving the People every favorable inference from the evidence adduced, we must conclude that the defendant's excessive speed, by itself, was insufficient to constitute the requisite depravity contemplated by Penal Law § 125.25 (2).

As the dissent notes, there is no doubt that an automobile may constitute the instrumentality of depraved conduct (*see People v Gomez*, 65 NY2d 9 [1985] [automobile speeding down a sidewalk hitting pedestrians]). However, the conduct and the circumstances surrounding its use must be beyond mere recklessness and must demonstrate a depraved indifference to human life (*see People v Payne*, 3 NY3d 266 [2004]). The facts in the cases cited by the dissent clearly demonstrate the difference in the degree of culpability necessary to sustain a conviction under Penal Law § 125.25 (2) in sharp contrast to the circumstances present herein. For example, in *People v Esposito* (216 AD2d 317 [1995]) the defendant did not merely engage in a game of cat and mouse in the manner suggested by some of the testimony in the present case. The defendant had been drinking before the incident in question, used his automobile to ram a parked vehicle, and had even used it to run down a pedestrian (not the decedent), threatening to kill him. Thereafter, he chased the decedent's car under circumstances evincing an intent to kill as the cars actually engaged in repeated bumping, which one witness described as appearing to be an attempt to force the decedent's vehicle off the road. The foregoing all occurred at excessive rates of speed on residential suburban streets in close proximity to homes, with the defendant totally ignoring numerous traffic control devices and a pursuing police officer. After the accident, the defendant left the scene without stopping to see if the decedent had been injured as a result of the impact of his vehicle with a tree.

Similarly, in *People v Legendre* (134 AD2d 525 [1987]), the defendant engaged in drag racing on a residential street in Brooklyn at 5:00 P.M. with numerous children present, again ignoring traffic control devices and struck a young child walking in the street. The defendant also fled the scene of the accident without any attempt to aid the victim, thus clearly further demonstrating the requisite depraved indifference to human life. In *People v Keating* (283 AD2d 589 [2001]), cited by the dissent, the defendant was intoxicated (with a blood alcohol level found to be nearly twice the legal limit). The defendant sped down residential streets at rates twice the posted speed limit, ignoring traffic control devices, colliding with several vehicles, before hitting the decedent and fleeing the scene of the accident.

In all of the cases cited by the dissent, the evidence was such that the jury could find beyond a reasonable doubt that the respective defendants evinced a depraved indifference to human life and were not merely reckless. Even when viewing the evi-

dence in the light most favorable to the prosecution (*see People v Contes*, 60 NY2d 620 [1983]), the evidence in the instant case is devoid of any indicia of depravity, i.e., such wanton conduct evincing indifference to human life.

In the present case, the evidence seems to indicate that it was the driver of the victims' car who was under the influence of illegal substances, not the defendant. The speeding occurred on a roadway designed to accommodate greater rates of speed than residential roads, at an hour when lighter traffic conditions predominated, and in an area where the possibility of damage to residences or pedestrians was virtually non-existent. No contact occurred between the defendant's vehicle and any other vehicle before the accident. The gravest threat to human life by the defendant's driving was posed by the presence of other vehicles on the parkway. Significantly, the unrefuted evidence indicated that, notwithstanding occasionally achieving excessive rates of speed, the defendant repeatedly slowed his vehicle where the traffic conditions so warranted. This is the antithesis of a depraved, as opposed to a reckless, state of mind (*see People v Poplis, supra; People v Thacker*, 166 AD2d 102 [1991]; *People v Asaro*, 182 AD2d 823 [1992]). Based on those facts, the People failed to demonstrate that the defendant's culpability was equivalent to that of one who purposefully causes the death of another (*see People v Russell, supra*). Thus, the defendant's convictions of depraved indifference murder must be reversed and those counts of the indictment dismissed. Since the crime of assault in the first degree in this instance also requires a finding of "circumstances evincing a depraved indifference to human life" (Penal Law § 120.10 [3]), the conviction of that count must also be reversed and that count of the indictment dismissed (*see People v France, supra*).

Moreover, the Supreme Court erred in limiting the jury's consideration of the evidence of the medical condition of the driver of the Honda to the impeachment of his credibility. In so doing, the Supreme Court eliminated from the jury's consideration the possibility that the accident was caused solely by the drug-influenced actions of the driver of the Honda. The Supreme Court's ruling, coupled with the charge that the negligence of other drivers was always foreseeable, also prevented the jury from considering whether the actions of the driver of the Honda, in traversing three lanes of moving traffic on the Belt Parkway to reach the service station in the median in the early morning hours, while potentially impaired by intoxicants, constituted such a departure from driving norms as to be unforeseeable, i.e., beyond the mere negligence of the other motorists, suf-

ficient to negate the defendant's responsibility in causing the accident. Therefore, the convictions of assault in the second degree must be reversed and the matter remitted to the Supreme Court for a new trial on, inter alia, those counts of the indictment.

We note that the errors set forth above were compounded when, over the objection of the defense counsel, the prosecutor, during her summation, knowing that the defense was restricted in using evidence that the driver of the Honda was impaired by drugs or alcohol, and that the court had sustained the prosecutor's objection to the defense's reference to such circumstance, asked the jury "[W]here are the beer cans. Where is the crack." In neither instance did the court issue an explanation to the jury as to its divergent treatment of that issue and the importance, if any, the jury was permitted to attach to such circumstance.

After the jury expressed uncertainty as to the charge and requested clarification in writing, the Supreme Court repeated the charge initially presented. The court stated that portion of the model charge which defines recklessness, but failed to adequately and completely set forth an explanation of the portion dealing with depravity. Absent from the court's explanation to the jury was that portion of the charge which specifies that conduct may be considered depraved if the jury finds it to be "so inhuman, as to demonstrate an attitude of total and utter disregard for the life of the person or persons endangered" (*see* CJI2d[NY] Penal Law § 125.25 [2]; *People v Roe*, 74 NY2d 20 [1989]; *People v Fenner, supra; People v Register, supra*).

The defendant's remaining contentions are without merit. Krausman, Luciano and Lifson, JJ., concur.

Goldstein, J., concurs in part and dissents in part, and votes to affirm the defendant's convictions of reckless driving and driving without a license, and to order a new trial with respect to all the remaining counts of which the defendant was convicted, with the following memorandum, in which Florio, J.P., concurs: I concur with the majority that the defendant is entitled to a new trial because of trial errors. However, I disagree with the conclusion of the majority that the counts of the indictment charging the defendant with murder in the second degree (two counts) and assault in the first degree upon the theory that he acted with depraved indifference to human life should be dismissed.

At about 4:00 A.M. on January 16, 2000, two Mercedes-Benz vehicles, one a light-colored Mercedes driven by the defendant and the other a dark-colored burgundy or maroon Mercedes,

passed vehicles on the eastbound Belt Parkway at a speed of 80 to 90 miles per hour. After slowing down for a cluster of 10 or 12 vehicles, the two vehicles accelerated to a speed which eyewitnesses estimated was 100 miles per hour or more. There were other cars on the road and the two Mercedes vehicles were "zigzagging" and weaving in and out of traffic around other vehicles which were proceeding in the center lane. The two Mercedes vehicles appeared to be racing each other in what was characterized as a "game of cat and mouse," with both vehicles "weaving in and out of traffic . . . almost like a train where the first car goes the second one goes regardless because they're on tracks."

The two Mercedes vehicles passed a sport utility vehicle in the center lane at a speed of at least 100 miles per hour, causing the sport utility vehicle to shake, and continued "in separate lanes with one lane in between them . . . neck and neck."

The defendant's vehicle passed a Nissan Pathfinder on the right at a speed of at least 100 miles per hour, while the driver of the maroon Mercedes passed the Pathfinder on the left. The driver of the Pathfinder testified at trial that he "embraced" his steering wheel with both hands because his vehicle "started shaking when they passed me." The defendant's vehicle cut in front of the Pathfinder, forcing its driver to bear to the left.

Just west of a gas station situated in the median between the eastbound and westbound traffic lanes of the Belt Parkway, the two Mercedes were both traveling in the left lane with the maroon Mercedes in the lead. The maroon Mercedes veered to the right and sped away. The defendant's vehicle collided with the rear of a Honda vehicle as the Honda turned into the gas station. The owner of the Honda testified that the Honda was traveling at between 40 and 50 miles per hour before impact. The defendant admitted to the police that he had no time to stop to avoid hitting the Honda. His vehicle left tire marks indicating that the brakes were not engaged before the collision.

After striking the Honda, the defendant's vehicle traveled another 366 to 368 feet, which distance is "[l]onger than a football field." His vehicle hit a guide rail, tore the guide rail out of the ground, overturned, and burst into flames. The estimated speed of the defendant's vehicle after it hit the guide rail was 73 miles per hour.

The Honda was pushed onto the entrance ramp of the gas station, mounted the guide rail, and rode the guide rail until it flipped over and hit the pavement after traveling 376 feet from the point of impact. The front of the Honda then hit a 20-foot long stretch limousine and pushed the limousine an additional 212 feet.

An accident investigation expert who testified on behalf of the People at trial stated that in his opinion, at the instant it struck the Honda, the Mercedes was traveling between 98 and 108 miles per hour with a likely speed of 102 miles per hour. The expert indicated that the defendant "could have been going faster because through the equation that I use, I used lower figures . . . to achieve a conservative analysis." As noted by the majority, the expert based his calculations on the factory weights of the Honda and the Mercedes. However, the expert further testified that "if you put another 1,000 pounds [in] the Honda, that raises the speed of the Mercedes. If you put another thousand pounds in the Mercedes, that reduces the speed of the Mercedes somewhat;" if the weights of both vehicles were both increased the "trajectory in a crash will remain roughly the same because I have increased the weights of . . . each vehicle."

"Generally, the assessment of the objective circumstances evincing the actor's 'depraved indifference to human life'—i.e., those which elevate the risk to the gravity required for a murder conviction—is a qualitative judgment to be made by the trier of facts" (*People v Roe*, 74 NY2d 20, 25 [1989]; *see People v Keating*, 283 AD2d 589 [2001]; *People v Soto*, 240 AD2d 768, 769 [1997]) which should be upheld if there is evidence to support the determination (*see People v Roe, supra* at 25). Depraved indifference murder "results not from a specific, conscious intent to cause death, but from an indifference to or disregard of the risks attending [the] defendant's conduct" (*People v Gonzalez*, 1 NY3d 464, 467 [2004]). "It will suffice if it can be said beyond a reasonable doubt . . . that the ultimate harm is something which should have been foreseen as being reasonably related to the acts of the accused" (*People v Kibbe*, 35 NY2d 407, 412 [1974]). Depraved indifference to human life may be found when an automobile is "used . . . in a wanton and callous manner, thereby posing a grave risk of death" (*People v Gomez*, 65 NY2d 9, 12 [1985]).

In the instant case, the majority acknowledges that the defendant's argument that the evidence was legally insufficient was unpreserved for appellate review (*see People v Finger*, 95 NY2d 894, 895 [2000]; *People v Gray*, 86 NY2d 10, 19-21 [1995]). Nevertheless, the majority contends that the "equivocal nature of the evidence upon which the conviction was based warrants the invocation of our interest of justice jurisdiction." "[T]he interest of justice power permits an intermediate appellate court to vacate a conviction . . . when 'there is a grave risk that an innocent man has been convicted' " of the charges (*People v Carter*, 63 NY2d 530, 536 [1984], quoting *People v Kidd*, 76

AD2d 665, 668 [1980]; *see People v Gioeli*, 288 AD2d 488 [2001]; *People v Henderson*, 275 AD2d 948 [2000]; *People v Carthrens*, 171 AD2d 387, 392 [1991]). No such risk is present in this case.

Viewing the evidence in the light most favorable to the prosecution as we must (*see People v Contes*, 60 NY2d 620, 621 [1983]), the evidence was legally sufficient to establish that the defendant acted with depraved indifference to human life. Further, the totality of the circumstances establish that the jury's verdict was not against the weight of the credible evidence (*see People v Kirkpatrick*, 177 AD2d 508 [1991]; *People v Legendre*, 134 AD2d 525, 526 [1987]). In exercising its factual review power, this Court must be careful not to substitute itself for the jury since "[g]reat deference is accorded to the fact-finder's opportunity to view the witnesses, hear the testimony and observe demeanor" (*People v Bleakley*, 69 NY2d 490, 495 [1987]).

Contrary to the majority's conclusion, the testimony presented at the trial was not inconsistent or equivocal. The testimony of disinterested eyewitnesses not involved in the accident demonstrated that after the defendant was forced to slow down for a cluster of other vehicles which he could not pass, he accelerated to a speed of approximately 100 miles per hour and proceeded with his " 'cat and mouse' game" (*People v Esposito*, 216 AD2d 317, 318 [1995]) on a high-speed multi-lane roadway amongst other traffic on the roadway (*see People v Keating, supra; People v Hoffman*, 283 AD2d 928 [2001]; *People v Legendre, supra*).

The eyewitnesses' testimony was corroborated by physical evidence and the testimony of the People's expert. The majority's criticism of the expert's methods goes to the weight to be accorded his testimony and not the admissibility of his testimony.

The majority concludes that the "unrefuted evidence indicated that . . . the defendant repeatedly slowed his vehicle where the traffic conditions so warranted." (*Supra* at 405.) This conclusion is not supported by the record. The testimony of the disinterested eyewitnesses was that the defendant slowed down on two occasions because he was looking for the other Mercedes in order to continue his race with that vehicle. Further, upon the approach to the gas station, which was clearly marked and "pretty lit up," the defendant made no effort to slow down or brake although traffic conditions clearly so warranted.

The majority also cites to additional factors which, under the facts presented at the trial and pursuant to well-settled law, are not relevant to the question of whether the defendant acted with depraved indifference to human life.

The majority notes that the defendant was precluded from

developing evidence that the driver of the Honda may have been under the influence of illegal substances. However, our determination of the sufficiency of the evidence must be based upon the record before us, not speculation as to whether the defense counsel's additional exploration of drug use by the driver of the Honda which may be presented at a new trial would create a reasonable doubt. The evidentiary errors at trial are not grounds for dismissal of any charges but rather the basis for a new trial (*see People v Bouton*, 50 NY2d 130, 136 [1980]).

Since no residences or pedestrians were present on the Belt Parkway the majority would find that depraved indifference to human life was not established since "[t]he gravest threat to human life by the defendant's driving was posed by the presence of other vehicles on the parkway." (*Supra* at 405.) However, vehicles have drivers and passengers, as the testimony of the disinterested eyewitnesses demonstrated. There is no basis to conclude that persons occupying vehicles on a highway dedicated to vehicular traffic have less rights to a safe passage than persons on a residential street.

The majority notes that the defendant did not collide with any other vehicle before the accident. However, on this point, the Court of Appeals has explicitly held that it is not necessary that "one person be struck first for the conduct to constitute depraved indifference" (*People v Roe, supra* at 25 n 4; *see People v Gomez, supra* at 12).

The majority notes that traffic was relatively light on the Belt Parkway in the early morning hours. This circumstance merely allowed the defendant to accelerate to speeds in excess of 100 miles per hour and weave in and out of traffic without injury to himself, before ultimately colliding with the victims' vehicle. The relatively light traffic did not undercut the jury's determination that the defendant acted with depraved indifference to human life (*see People v Rodriguez*, 217 AD2d 403, 404 [1995]; *see also People v Parks*, 281 AD2d 217 [2001]).

Further, the majority notes that there is no evidence of the defendant's intoxication. Although voluntary intoxication is not a defense to depraved mind murder (*see People v Register*, 60 NY2d 270, 279 [1983], *cert denied* 466 US 953 [1984]; *People v Hilligas*, 291 AD2d 926 [2002]) it is not an element of the crimes charged. Driving while unable to perform requisite driving skills due to voluntary intoxication may constitute some evidence of wantonness (*see People v Thacker*, 166 AD2d 102, 109 [1991]). However, in the instant case, the defendant's ability to perform requisite driving skills was not in issue. Rather, the evidence

indicated that the defendant attempted to prove that he had superior driving skills, while ignoring the grave risk to other persons on the road.

The majority also describes the defendant as having an "unblemished record." The fact that the defendant's past conduct may be described as an "unblemished record" is not relevant to whether the People proved his guilt of the crimes charged beyond a reasonable doubt. Such a factor is relevant to sentencing, not to guilt or innocence of the crimes charged. On this point, the Supreme Court noted at sentencing that there was no excuse for the defendant treating the Belt Parkway as his "personal playground" and his "personal Indianapolis Speedway."

In view of the foregoing, the new trial should include the counts of the indictment charging the defendant with murder in the second degree (two counts) and assault in the first degree on the theory that the defendant acted with depraved indifference to human life.