People v Williams (2022 NY Slip Op 03945)

People v Williams

2022 NY Slip Op 03945

Decided on June 16, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 16, 2022

111989
[*1]The People of the State of New York, Respondent,
v
Ryan B. Williams, Appellant.

Calendar Date:April 21, 2022

Before:Lynch, J.P., Clark, Pritzker, Colangelo and McShan, JJ.

Karen G. Leslie, Riverhead, for appellant.
David J. Clegg, District Attorney, Kingston (Lauren D. Konsul, New York State Prosecutors Training Institute, Inc., Albany, of counsel), for respondent.

Clark, J.
Appeal from a judgment of the County Court of Ulster County (Williams, J.), rendered July 2, 2019, upon a verdict convicting defendant of the crimes of murder in the second degree, aggravated vehicular homicide (four counts), aggravated unlicensed operation of a motor vehicle in the first degree, assault in the second degree (two counts) and unlawfully fleeing a police officer in a motor vehicle in the first degree.
In July 2018, a police officer attempted to effectuate a traffic stop of a vehicle driven by defendant after receiving a report of erratic driving. After momentarily complying with the stop, defendant elected to flee and a high-speed chase ensued, which ultimately led to defendant's collision with two vehicles, resulting in the death of one victim and serious physical injuries to two others. Defendant, unconscious, was medevacked from the scene of the accident and his blood was drawn upon intake at the hospital. Testing of that blood revealed that his blood alcohol content was .33%. For his conduct, defendant was charged with one count of murder in the second degree (depraved indifference murder), four counts of aggravated vehicular homicide, one count of aggravated unlicensed operation of a motor vehicle in the first degree, two counts of assault in the second degree, one count of unlawfully fleeing a police officer in a motor vehicle in the first degree and one count of manslaughter in the second degree. Following a jury trial, defendant was convicted as charged apart from the manslaughter count, which was dismissed as a lesser included offense of murder in the second degree. He was then sentenced to concurrent prison terms, the greatest of which was 25 years to life. He appeals.
Defendant first contends that the evidence supporting his conviction of murder in the second degree is legally insufficient to prove the requisite mens rea of depraved indifference to human life. His argument, however, was not adequately preserved by his general motion for a trial order of dismissal (see People v Jones, 202 AD3d 1285, 1286 [2022]; People v Mazzeo, 202 AD3d 1279, 1280 [2022]). Nevertheless, defendant also argues that his conviction is against the weight of the evidence, and it therefore remains our duty to ensure that the People established each element of depraved indifference murder beyond a reasonable doubt (see People v Hodgins, 202 AD3d 1377, 1378-1379 [2022]; People v Taylor, 196 AD3d 851, 852 [2021], lvs denied 37 NY3d 1025, 1030 [2021]). They did not.
To support their charge, the People were required to prove that, "[u]nder circumstances evincing a depraved indifference to human life, [defendant] recklessly engage[d] in conduct which create[d] a grave risk of death to another person, and thereby cause[d] the death of another person" (Penal Law § 125.25 [2]). "[D]epraved indifference is best understood as an utter disregard for the value of human life — a willingness to act not because one intends harm, but because one [*2]simply does[ not] care whether grievous harm results or not" (People v Feingold, 7 NY3d 288, 296 [2006] [internal quotation marks and citation omitted]; see People v Maldonado, 24 NY3d 48, 52-53 [2014]; People v Heidgen, 22 NY3d 259, 274-276 [2013]). "Reflecting wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts, depraved indifference is embodied in conduct that is so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy as to render the actor as culpable as one whose conscious objective is to kill" (People v Suarez, 6 NY3d 202, 214 [2005] [internal quotation marks and citation omitted]; see People v Hurdle, 106 AD3d 1100, 1102-1103 [2013], lvs denied 22 NY3d 956, 996 [2013]; People v Green, 104 AD3d 126, 129-130 [2013]). "Due to the wanton nature of this mens rea, 'depraved indifference murder properly applies only to a small, and finite, category of cases where the conduct is at least as morally reprehensible as intentional murder'" (People v Maldonado, 24 NY3d at 53, quoting People v Suarez, 6 NY3d at 207; see generally People v Barboni, 21 NY3d 393, 408, 408 n [2013, Smith, J., concurring]). As courts have observed, "cases involving a depraved indifference to human life are highly fact-specific," and such a mental state "may be extremely difficult to establish," even circumstantially (People v Heidgen, 22 NY3d at 276; see People v Feingold, 7 NY3d at 296; People v Herrera, 202 AD3d 517, 517 [2022]).
The evidence at trial demonstrated that at approximately 7:00 p.m. on one evening in July 2018, defendant, operating a Porsche Cayenne with a suspended or revoked license, approached the intersection of Milton Turnpike and US Route 9W in the Town of Marlborough, Ulster County, at a high rate of speed, his brakes "screeching" as he came to a stop for a red traffic light. The driver of a Jeep Grand Cherokee that had been stopped at that light testified that the sound caused him to "jump forward," but not into the intersection, whereas the Jeep's front seat passenger, the driver's wife, stated that her husband had to "jerk[] the Jeep over to get out of the way." At that time, the Porsche was two cars behind the Jeep. When the light turned green, both vehicles turned left onto US Route 9W, heading north, at which point there was one lane of traffic in each direction. The driver of the Jeep believed that the Porsche was "driving a little bit erratic[ally]," which he described as partially "going over the white line" once, "creating a bunch of dust off the side of the road," and partially "crossing over the double yellow line" twice. He also indicated, however, that, for the one to two miles that the Porsche was driving behind him, he "didn't feel threatened . . . at all" and "wasn't really worried." The Jeep's front seat passenger called 911.
While that call was being made, both vehicles came to a stop at a red traffic light where there were [*3]two northbound lanes. The driver of the Jeep testified that, as the Porsche pulled up to the light in the lane next to him, it "almost clipped" the Jeep. The occupants of the Jeep were then able to observe defendant, describing him as having a "blank stare in his eye" or as "looking right through" them while both vehicles sat at the light. When the light turned green, the Jeep waited for defendant to move ahead first. Defendant, initially unaware that the light had changed, took 10 to 15 seconds to respond, but, after other vehicles began honking their horns to alert defendant to the light, he "took off" on what was now a four-lane highway. A marked police vehicle ultimately located and began to follow the Porsche on a stretch of US Route 9W where guardrails separated the opposing lanes of traffic.
As defendant was slowing down for a red arrow and signaling to turn left onto State Route 299, the officer who had been following him activated his lights and effectuated a traffic stop of the Porsche. Defendant, who had come to a stop somewhat beyond the line at the traffic light, initially complied, completing his left-hand turn once the traffic light turned green and pulling over onto the right shoulder. However, after waiting for the officer to exit his vehicle and begin to approach the Porsche, defendant fled, creating a cloud of dust off the side of the road as he began to travel down the right shoulder. A high-speed chase westbound on State Route 299 ensued, and at least three other marked law enforcement vehicles joined in the pursuit, each traveling approximately 100 miles per hour (hereinafter mph) in attempts to catch up to defendant in the 55-mph zone.
During the pursuit, which lasted for about three miles, several witnesses observed defendant "swerving" or passing vehicles on the right via the paved shoulder, which, at most points, was roughly equal in width to a lane of traffic. A paramedic traveling eastbound on State Route 299 observed the Porsche moments before the subject collision. She testified that the vehicle, now traveling in the middle turning lane that separated the opposing lanes of traffic, came within "a couple feet" of the front of the ambulance as it passed her, but, in her view, the Porsche was not really swerving at that time. Video evidence obtained from various dashboard cameras reveals that traffic at the time of the pursuit was generally light and that the subject stretch of State Route 299 was largely rural with some interspersed businesses. During the pursuit, defendant passed through one intersection with a traffic light, which appears to have been green at the time.
The subject collision took place in the immediate vicinity of the intersection of State Route 299 and South Street in the Town of Lloyd, Ulster County. When approaching that intersection traveling westbound, State Route 299 had three westbound lanes of traffic and one eastbound lane. Those heading westbound were also notably traveling [*4]in the direction of a bright, setting sun. A witness who was traveling westbound and slowing down for the traffic light at that intersection — which had just turned yellow and was described by an area resident familiar with the light as a "long yellow" — noticed the Porsche in his rearview mirror. Although the Porsche initially seemed "a long way off," "in a matter of seconds" it was only 10 to 15 feet behind the witness' vehicle, its tires "squeal[ing]" as it veered off to the left and collided with a Ford F-150 traveling in the eastbound lane. The force of the impact launched the F-150 into the air, and it landed facing westbound on the eastbound "shoulder" — a portion of a rail trail under development at the time. After its impact with the F-150, the Porsche continued to spin out of control and "clipped" a nearby Toyota Prius on the front bumper, setting off the Prius' airbags. Photographic evidence of the scene shows that the Porsche was obliterated, its front end — including the engine — completely missing, its parts strewn about the road. As previously noted, it was later determined that defendant's blood alcohol content shortly after the time of the collision was .33% — over four times the legal limit. When interviewed by law enforcement days later, defendant stated that he had "blacked out" and was unable to recall any part of the subject events or his day leading up to his operation of the Porsche.
Victim A — the driver of the F-150 — died upon impact from countless blunt force injuries to all parts of her body. Victim B — the front seat passenger in the F-150 and victim A's daughter — sustained a compound femur fracture, multiple splenic lacerations and a brain bleed. Victim C — a rear seat passenger in the Prius — sustained vertebrae fractures and a sternal fracture, the latter made even more serious by certain preexisting medical conditions.
A reconstruction specialist from the State Police testified for the People, explaining that the subject traffic light could be seen by those traveling westbound on State Route 299 from approximately 1,800 feet away. Tire marks from the Porsche were present starting at 166 feet from the area of impact, which was approximately 175 feet before the point where westbound traffic would reach the light. Although there were no straight brake marks at the scene, yaw marks were present, indicating that the Porsche lost lateral stability and began to rotate prior to entering the eastbound lane of traffic and colliding with the F-150. The striation of those yaw marks established to a degree of scientific certainty that defendant was braking as the Porsche spun out of control into the F-150. Based upon his measurements from the scene and a momentum analysis, the reconstruction specialist was able to determine that the minimum speed at the time of impact was 112 mph whereas the minimum speed the Porsche was traveling prior to braking was 128 mph. At 128 mph, the Porsche would have traversed the [*5]approximately 1,600 feet between sight of the traffic light and the time of braking in less than 10 seconds.
Upon viewing the trial evidence in a neutral light, a different verdict as to murder in the second degree would not have been unreasonable, given the near absence of evidence concerning the requisite mental state of depraved indifference to human life. Indeed, "intoxicated driving cases that present circumstances evincing a depraved indifference to human life are likely to be few and far between" (People v Heidgen, 22 NY3d at 267). It has been observed that, because of their inflammatory facts, such cases are "among the most likely to generate depraved indifference murder convictions where a conviction of a lesser (but still serious) crime is all that is warranted" (id. at 281 [Smith, J., dissenting]).
Here, the credible evidence at trial made clear that defendant was extremely intoxicated, but his driving prior to police pursuit demonstrated that he was aware of his surroundings, obeyed multiple traffic signals and responded to the alerts of other drivers. Although he was traveling at an exceptionally high rate of speed during the pursuit, he did so "on a roadway designed to accommodate greater rates of speed than residential roads, at an hour when lighter traffic conditions predominated" (People v Lazartes, 23 AD3d 400, 405 [2005]), and there is no evidence that he failed to abide by any traffic signals while he fled or that any vehicles were forced to pull over or move out of his way (compare People v Heidgen, 22 NY3d at 268, 273, 279; People v Williams, 150 AD3d 1273, 1274-1277 [2017], lv denied 29 NY3d 1135 [2017]). According deference to the jury's credibility determinations, defendant did partially enter the lane of oncoming traffic for brief periods of time, but such "episodic" conduct stands in stark contrast to cases where the defendant traveled in an oncoming lane "as part of a deadly game" (People v Maldonado, 24 NY3d at 54; compare People v Heidgen, 22 NY3d at 268, 272-273; People v Herrera, 202 AD3d at 517-518). Defendant in fact largely chose to evade police not by weaving in and out of the oncoming lane but instead by driving on a wide, paved shoulder, and, even if his "attempted escape [was] carried out in a reckless manner," he may "simultaneously intend to flee police and avoid striking other cars" (People v Maldonado, 24 NY3d at 56-57). "No contact occurred between [defendant's] vehicle and any other vehicle before the accident" (People v Lazartes, 23 AD3d at 405), and the limited evidence of his proximity to other vehicles prior to the collision falls short of establishing the sort of "narrow[] miss[es]" the disregard of which could be some evidence of depraved indifference (People v Williams, 150 AD3d at 1276; see People v Maldonado, 24 NY3d at 55-56; compare People v Heidgen, 22 NY3d at 278; People v Gomez, 65 NY2d 9, 12 [1985]). There was also evidence that, while approaching a "long yellow" light, defendant [*6]did not engage his brakes, notwithstanding the fact that his obviously ineffective braking coincided with his loss of control of the vehicle (compare People v Heidgen, 22 NY3d at 269, 272, 273, 279; People v Herrera, 202 AD3d at 517-518).
"A defendant who knowingly pursues risky behavior that endangers others does not necessarily evince depraved indifference by engaging in that conduct" (People v Maldonaldo, 24 NY3d at 53), and, here, defendant "sought to mitigate the consequences of his reckless driving . . . [by] 'actively attempt[ing] to avoid hitting other vehicles'" (id. at 56, quoting People v Heidgen, 22 NY3d at 276; see People v Prindle, 16 NY3d 768, 771 [2011]). There is no direct evidence of defendant's mental state or even the events leading up to his operation of the Porsche, and the circumstantial evidence put forth by the People permits only the inference that defendant, while reckless, consciously avoided risk, which "is the antithesis of a complete disregard for the safety of others" (People v Maldonado, 24 NY3d at 54). In light of the lack of evidence establishing that he did not care whether grievous harm resulted, defendant's conviction of murder in the second degree is against the weight of the evidence (see People v Maldonado, 24 NY3d at 53-58; People v Prindle, 16 NY3d at 769-771; People v Valencia, 14 NY3d 927, 927-928 [2010]; compare People v Heidgen, 22 NY3d at 278-279; People v Williams, 150 AD3d at 1276). We therefore modify the judgment by reducing said conviction to manslaughter in the second degree (see Penal Law § 125.15 [1]) and remit the matter for resentencing (see People v Prindle, 16 NY3d at 769-771).[FN1]
In view of our foregoing conclusion, several of defendant's remaining arguments are academic, including his claim that his degree of intoxication prevented him from forming the requisite mental state (see generally Penal Law § 15.25; People v Valencia, 14 NY3d at 929-931 [Graffeo, J., concurring]; CJI 125.25 [2], n 15), his related, unpreserved contention regarding County Court's re-instruction for depraved indifference (see generally CPL 470.15 [1]) and his challenge to the severity of the sentence imposed on the top count (see People v Harris, 186 AD3d 907, 913 [2020], lv denied 36 NY3d 1120 [2021]; People v Brown, 100 AD3d 1035, 1037 [2012], lv denied 20 NY3d 1009 [2013]).
Defendant's surviving contentions warrant little discussion. His assertion that his conviction for aggravated unlicensed operation of a motor vehicle in the first degree must be dismissed as an inclusory concurrent count of his aggravated vehicular homicide convictions is unavailing, as none of the latter convictions required the element that defendant have a revoked or suspended license (see CPL 300.30 [4]; 300.40 [3] [b]; Penal Law § 125.14 [1], [3], [5]; Vehicle and Traffic Law §§ 511 [3] [a] [i]; 1212; compare People v Ferguson, 193 AD3d 1253, 1257-1258 [2021], lv denied 37 NY3d 964 [2021]; People v Williams, 150 AD3d at 1279). [*7]His challenge to County Court's discretionary time restrictions on the jury voir dire process is unpreserved (see People v Sewnarine, 156 AD3d 459, 459-460 [2017], lv denied 31 NY3d 1087 [2018]; People v Beecham, 74 AD3d 1216, 1216 [2010], lv denied 15 NY3d 918 [2010]; People v Koury, 268 AD2d 896, 897 [2000], lv denied 94 NY2d 949 [2000]) and, in any event, unpersuasive, particularly in light of the court's repeated reassurance that it would permit additional time if necessary (see CPL 270.15 [1] [b]; People v Jean, 75 NY2d 744, 745 [1989]; People v Marlett, 191 AD3d 1183, 1186-1187 [2021], lv denied 37 NY3d 966 [2021]; People v Davis, 166 AD2d 453, 453 [1990], lv denied 76 NY2d 985 [1990]; compare People v Steward, 17 NY3d 104, 110-114 [2011]).
Lastly, defendant contends that he was deprived of his right to the effective assistance of counsel, setting forth a litany of allegations in support of his claim, most in passing. Many of defendant's specific criticisms of counsel involve matters of strategy (see generally People v Rivera, 71 NY2d 705, 709 [1988]), for example, counsel's decision to, in her opening statement, face head on the "horrible" nature of victim A's death (see People v Sposito, 37 NY3d 1149, 1151 [2022]) and to focus on the indicia of defendant's concern for others to disprove depraved indifference, as opposed to exclusively pursuing a theory that defendant was too intoxicated to form that mental state (see People v Benevento, 91 NY2d 708, 714 [1998]). Although defense counsel did not object to the prosecutor's improper burden-shifting remark during summation that certain evidence was "uncontroverted" (see People v Smith, 288 AD2d 496, 497 [2001]), this failure alone does not negate the effectiveness of counsel, who, among other things, engaged in relevant motion practice, presented cogent opening and closing statements and vigorously cross-examined the People's witnesses, particularly with respect to the blood evidence and defendant's braking. Viewing the totality of counsel's representation, we are assured that defendant received the meaningful representation promised to him by the NY Constitution (see People v Gross, 26 NY3d 689, 693 [2016]). Given that "our state standard . . . offers greater protection than the federal test," his claim of ineffective assistance of counsel under the US Constitution must also fail (People v Caban, 5 NY3d 143, 156 [2005]).
Pritzker, Colangelo and McShan, JJ., concur.
Lynch, J.P. (concurring in part and dissenting in part).
I respectfully dissent, in part, because it is my view that the weight of the evidence sufficiently supports defendant's conviction for depraved indifference murder. There is no question that defendant was driving in an extremely reckless manner, but recklessness and depraved indifference are different mental states. "Depraved indifference is a culpable mental state which is best understood as an utter disregard for the value of human life" (People v Maldonado, [*8]24 NY3d 48, 52 [2014] [internal quotation marks and citation omitted]). Pertinent to automobile cases, the "conscious avoidance of risk is the antithesis of a complete disregard for the safety of others" (id. at 54).
As recounted by the majority, in response to a report concerning defendant's erratic driving, the responding officer was able to initiate a traffic stop at the intersection of US Route 9W and State Route 299. At that point, defendant was in the left turn lane at a red light of US Route 9W, with his left blinker on. The officer activated his lights and, in response, defendant completed the left turn and pulled over onto the right shoulder of Route 299. Once the officer exited his vehicle and began to approach, defendant abruptly fled in his vehicle, traveling westbound on Route 299. A high-speed chase ensued, ending with a violent, fatal collision near the intersection of Route 299 and South Street in the Town of Lloyd, Ulster County.
An accident reconstruction specialist with the State Police testified that the distance from the traffic stop to the accident scene was about four miles. Route 299, in this area, is a two-lane highway with a 55 mile-per-hour speed limit. The officer's camera footage shows that defendant traveled that distance in about 2½ minutes. Along the route, defendant passed three westbound vehicles by driving in the paved right shoulder. The traffic light at the intersection of Route 299 and South Street was visible to a westbound driver from a distance of approximately 1,800 feet. Based on scrapes and gouge marks in the road starting at 166 feet from the point of impact, and 175 feet from the traffic light, the reconstruction specialist testified that defendant's vehicle lost lateral stability and began to rotate out of control. Once that happened, defendant was unable to steer the vehicle. This witness explained that defendant applied his brakes at about the same time that the vehicle lost lateral stability, noting that the brake marks only started once the car was rotating. At that point, the vehicle was going a minimum speed of 128 miles per hour (hereinafter mph). At impact, the vehicle was travelling a minimum speed of 112 mph. The vehicle traveled the 166 feet, i.e. from the point it lost control to the point of impact, in .939 milliseconds.
In my view, this scenario demonstrates that defendant did not meaningfully attempt "to mitigate the consequences of his reckless driving" (id. at 53). Approximately 30 seconds before the collision, defendant did pass three vehicles using the right shoulder. As he approached the Route 299/South Street intersection, however, he continued to drive at least 128 mph, even though the traffic light, which had turned yellow, was clearly visible from an extended sight distance. That he finally endeavored to brake upon losing control was not a viable attempt to mitigate his egregious driving and any such effort was far too late to avoid the tragic consequences [*9]of his actions (compare People v Edwards, 36 NY3d 946, 947 [2020]). He only reacted, at best, in less than a second before the collision. With this evidence, the jury could readily conclude that defendant drove his vehicle with an utter disregard for the life and well-being of his unfortunate victims.
With respect to defendant's intoxication, "[c]ircumstantial evidence can be used to establish the necessary mens rea" (People v Heidgen, 22 NY3d 259, 275 [2013] [citation omitted]). It cannot seriously be disputed that defendant was highly intoxicated. He stated to law enforcement days after the accident that he had "blacked out" and was unable to recall the event. And yet, it is particularly telling that defendant pulled off onto the shoulder when the officer activated his lights at the intersection of US Route 9W and Route 299. That ploy, however, lasted only a moment, as defendant took off at a high rate of speed, leaving the officer standing in the road. Such a deceptive escape maneuver indicates that defendant was conscious of his actions — and that decision was made only 2½ minutes before the fatal collision. Under the circumstances presented, defendant's intoxication does not preclude a finding of depraved indifference (see People v Valencia, 14 NY3d 927, 929-931 [2010] [Graffeo, J., concurring]; CJI 125.25 [2] n 15). Defendant's challenge to the manner in which County Court re-instructed the jury on depraved indifference following an inquiry during deliberations is unpreserved, as defendant failed to object to the manner in which the charge was given (see People v Every, 146 AD3d 1157, 1165 [2017], affd 29 NY3d 1103 [2017]). Finally, given the tragic consequences of defendant's actions, the sentence imposed was not unduly harsh or severe. The judgment should be affirmed in its entirety.
ORDERED that the judgment is modified, on the facts, by reducing defendant's conviction of murder in the second degree to manslaughter in the second degree and vacating the sentence imposed thereon; matter remitted to the County Court of Ulster County for resentencing; and, as so modified, affirmed.

Footnotes

Footnote 1: Although Prindle involved the "objective-circumstances" standard of People v Register (60 NY2d 270, 276 [1983]), since overruled by People v Feingold (7 NY3d 288, 296 [2006]), "Prindle continues to provide important guidance because where, as in that case, the evidence is insufficient to establish depraved indifference under Register, it will most assuredly fail to meet the Feingold culpable-mental state requirement" (People v Maldonado, 24 NY3d at 55 n 1).