PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JEANETTE RENE' ABNEY,
Administratrix of the Estate of
Gerald Benjamin Abney, Jr., and
The State of North Carolina ex rel.
Jeanette Rene' Abney,
Administratrix of the Estate of
Gerald Benjamin Abney, Jr.,
*Plaintiff-Appellee,*

v.

JOEL RODNEY COE, Deputy,
individually and in his official
capacity as a Deputy of the
Randolph County Sheriff's
Department; WESTERN SURETY
COMPANY,

> No. 06-1607

*Defendants-Appellants,*

and

LITCHARD HURLEY, Sheriff,
individually and in his official
capacity as Sheriff of Randolph
County; RANDOLPH COUNTY,
*Defendants.*

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
N. Carlton Tilley, Jr., Chief District Judge.
(1:04-cv-00652-NCT)

Argued: May 22, 2007

Decided: July 3, 2007

Before WIDENER, WILKINSON, and KING, Circuit Judges.

---

Reversed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Widener and Judge King joined.

---

**COUNSEL**

**ARGUED:** Rachel Ellen Daly, WOMBLE, CARLYLE, SAN-DRIDGE & RICE, P.L.L.C., Winston-Salem, North Carolina, for Appellants. Elliot S. Richardson, RICHARDSON, STASKO, BOYD & MACK, L.L.C., Chicago, Illinois, for Appellee. **ON BRIEF:** Allan R. Gitter, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Winston-Salem, North Carolina, for Appellants. David S. Lipschultz, RICHARDSON, STASKO, BOYD & MACK, L.L.C., Chicago, Illinois; Brady A. Yntema, PINTO, COATES, KYRE & BROWN, P.L.L.C., Greensboro, North Carolina, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

In this case a motorcyclist refused to stop for a sheriff deputy's flashing blue lights and siren over the course of an eight mile pursuit. The pursuit ended when the deputy's car and the motorcycle collided killing the motorist, Gerald Abney. Abney's estate brought suit under 42 U.S.C. § 1983 (2000) alleging, inter alia, that defendant Deputy Rodney Coe used excessive force in violation of Abney's Fourth Amendment rights. The district court denied defendants' motion for summary judgment holding that — if intentional — Deputy Coe's conduct "would violate Mr. Abney's Fourth Amendment right to be free from unreasonable seizures," since Abney did not pose a serious threat to others. Because Deputy Coe's conduct was objectively reasonable under *Scott v. Harris*, ___ U.S. ___, 127 S. Ct. 1769 (2007), and necessary to stop conduct that put the safety of other motorists

at significant risk, we hold that Abney's Fourth Amendment rights were not violated and reverse the judgment.

I.

On August 3, 2001, Deputy Sheriff Rodney Coe was traveling north on Old Country Farm Road near Asheboro, North Carolina. He observed a motorcycle driven by Gerald Abney (who was later determined to be driving under the influence of methamphetamine) crossing double yellow lines while passing a vehicle on a curve. Deputy Coe turned around his patrol car and activated his blue flashing lights and siren in an attempt to pull Abney over. Abney did not stop, however. Instead, Abney went around a second curve — again in the opposite lane of traffic — and ran Thomas and Dorothy White off the road. Abney was then able to lose Deputy Coe, who turned off his lights and siren.

Deputy Coe caught up with Abney at the intersection of Caraway Mountain and Old Lexington Road. Coe reactivated his lights and siren. Instead of pulling over, however, Abney took off. He passed yet another vehicle, again crossing over double yellow lines, and turned left onto Green Farm Road.

The motorcycle and Coe's patrol car made brief contact shortly after the turn onto Green Farm Road. The parties disagree about who hit whom. Deputy Coe relies upon bystander Thomas Whitman's testimony that when Abney "made his left turn, he ran through a ditch . . . c[a]me back out toward the road and r[a]n into the side of the cop car, knocking the mirror loose from the door." Plaintiff contends, based on the observations of other witnesses, that Coe intentionally struck the back of Abney's motorcycle.

After the collision on Green Farm Road, Abney returned to the roadway and took off again. Deputy Coe called in to report the collision and his continued pursuit of Abney down Green Farm Road. As Coe followed, Abney ran a stop sign while swerving around a van which was stopped at the sign. The driver of the vehicle, Linda Flecken, testified that while she was stopped she "saw a motorcycle come flying around [her], cross the yellow line, into the other lane of traffic, [and] pull[ ] out."

Deputy Jerry Rozier responded to the scene for back-up. He joined the pursuit from the opposite direction, traveling down Old Lexington Road toward Abney and Coe. In an effort to stop Abney, Rozier parked his vehicle in the center of the two-lane road — directly in Abney's path — and started to get out of his patrol car. Abney, however, did not stop; he swerved around Deputy Rozier and sped away.

Abney continued to flee down Old Lexington Road and the two deputies followed. The suspect crossed into the opposite lane of traffic while passing several vehicles on a sharp curve. Abney then turned onto Highway 64, running the stop sign, and causing several motorists to slow down quickly. The traffic on Highway 64 was fairly heavy and neither Abney nor Deputy Coe exceeded the 55 mile-per-hour speed limit.

Abney made a right hand turn onto Mount Shepherd Road and Deputy Coe followed. A few seconds after the vehicles turned, Coe's patrol car and the motorcycle collided for the second time. The motorcycle was knocked off the road and into an embankment where the patrol car ran over it. Gerald Abney was pronounced dead on the scene.The parties offer conflicting versions of events surrounding the collision. Deputy Coe claims that Abney lost control of his motorcycle during the turn. He contends that the motorcycle went into a skid directly in front of him and decelerated rapidly; Coe slammed on his brakes and swerved to miss Abney, but was unable to avoid a collision. Plaintiff, on the other hand, has a very different view. Plaintiff alleges that Abney never lost control of the motorcycle but that Deputy Coe intentionally rammed the rear of Abney's motorcycle.

Abney's estate brought suit against Deputy Coe, Sheriff Lichard Hurley, and Western Surety Company (as the writer of an Official Bond as surety for defendant Sheriff Hurley pursuant to N.C. Gen. Stat. § 58-76-5). The estate raised claims under federal and North Carolina law based on the alleged use of unreasonable force. The district court granted defendants' motion for summary judgment as to all claims against Sheriff Hurley, and plaintiff does not appeal that order. This appeal concerns plaintiff's allegation that Coe used excessive force in violation of the Fourth Amendment. All of plaintiff's claims rise and fall on this question.

Adopting the Magistrate Judge's Recommended Ruling, the district court denied summary judgment on the federal claims brought against Coe in his individual capacity. The district court found that plaintiff's evidence "was sufficient to create a genuine issue of material fact as to whether Deputy Coe intentionally struck" and thus "seized" Abney. The court then held that, if Abney had in fact been seized, Deputy Coe's "conduct would constitute 'deadly force' and would violate Mr. Abney's Fourth Amendment right to be free from unreasonable seizures," because there was no evidence "from which a reasonable officer could conclude that Mr. Abney posed a serious threat to others." In the district court's view, Deputy Coe was not entitled to qualified immunity because "the 'state of the law' at the time of the events . . . gave [Deputy Coe] 'fair warning' that his [conduct] was unconstitutional." The court also denied summary judgment as to plaintiff's state law claims for gross negligence and wrongful death against Deputy Coe in both his individual and official capacities. Coe now appeals.

II.

Plaintiff contends that Deputy Coe's actions were unconstitutional because "Abney did not pose any risk to the public that justified using force that placed him at risk of serious injury or death." According to plaintiff, a "high-speed chase of a suspect fleeing after a traffic infraction does not amount to the 'substantial threat' of imminent physical harm that *Garner* requires before deadly force can be used." Plaintiff also argues that Deputy Coe is not entitled to qualified immunity because Coe was on notice that his conduct was unconstitutional.

In any qualified immunity analysis, we must first ask whether an officer violated a constitutional right at all. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If he did not violate any right, he is hardly in need of any immunity and the analysis ends right then and there. In this case, the right involved is the right to be free from excessive force. A claim of "excessive force" in the course of a seizure is analyzed "under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989).

The reasonableness inquiry is a balance. It requires courts to weigh "the nature and quality of the intrusion on the individual's Fourth

Amendment interests" against the governmental interests which prompted the intrusion in the first place. *Id.* at 396; *United States v. Place*, 462 U.S. 696, 703 (1983) (same). The requirement of reasonableness does not, however, demand statistical precision: it accords police officers "latitude in exercising what are inescapably discretionary functions replete with close judgment calls." *Gooden v. Howard County*, 954 F.2d 960, 964 (4th Cir. 1992) (en banc). Accordingly, reasonableness is evaluated from the perspective of the officer on the scene, not through the more leisurely lens of hindsight. *Graham*, 490 U.S. at 396-97; *Milstead v. Kibler*, 243 F.3d 157, 163 (4th Cir. 2001).

When public safety is the interest supporting a seizure, courts "consider the risk of bodily harm that [the officer's] actions posed to [the suspect] in light of the threat to the public that [the officer] was trying to eliminate." *Scott*, 127 S. Ct. at 1778. An officer's actions are reasonable when "preventing possible harm to the innocent justifies exposing to possible harm the person threatening them." *Id.* at 1778 n.10.

The parties agree that plaintiff's evidence is "sufficient to create a genuine issue of material fact as to whether Deputy Coe intentionally struck" and thus "seized" Abney.[1] *See Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) ("[A] Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied.") (emphasis omitted). Thus, we assume that Abney was seized, and turn to the threshold inquiry: whether Deputy Coe's conduct was reasonable under the Fourth Amendment.

---

[1]In their briefs, the parties argue at great length about the cause of the Green Farm and Mount Shepherd Road collisions. Plaintiff contends that Deputy Coe intentionally struck Abney's motorcycle on both occasions. Coe remembers events differently: He claims that both collisions were unavoidable accidents and that because he did not "intentionally appl[y]" force to stop Abney no seizure occurred under *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989). During oral argument, however, Deputy Coe's counsel conceded that there is a good deal of conflicting evidence on this point and that it was not an appropriate basis on which to ground judgment in Coe's favor.

### III.

Plaintiff contends that Deputy Coe plainly violated the Fourth Amendment in attempting to bring the chase to a halt. Abney had, after all, committed "only a minor [and thus presumably not dangerous] traffic infraction." Abney and Coe were "not engaged in a dangerous high-speed pursuit that threatened the lives of innocent bystanders," and Deputy Coe did not have "probable cause to believe that Mr. Abney posed . . . a serious threat to others." Thus, plaintiff asserts "it is abundantly clear" that the force Coe applied was disproportionate to any public risk.

Plaintiff, however, argues the facts as she wishes them, not as the record reveals them. The record is replete with examples of reckless driving designed to elude the police and executed with little consideration for the lives and safety of other motorists. Deputy Coe first noticed Gerald Abney when the motorcycle driven by Abney crossed a double yellow line to pass a vehicle on a curve at an estimated ten to fifteen miles per hour above the speed limit. Diane Davis, who drove the front vehicle in a line of three or four vehicles passed by Abney, testified that she was "literally scared to death"; "thought [Abney] was going to hit [her]"; and "felt in danger."

Deputy Coe turned on his blue flashing lights and siren — to no avail. Abney did not stop. Instead, he led Coe on an eight mile chase during the course of which he committed numerous dangerous traffic violations. Abney, for example, illegally passed vehicles by crossing double yellow lines on no less than five occasions — many of which involved speed, sharp curves, or both. On one occasion, Abney ran Thomas and Dorothy White off the road when he took a curve in the wrong lane of traffic. Ms. White testified that her husband "jerked the car and ran off the road. And I looked up, and there was a motorcycle on our side of the road." While plaintiff argues that Deputy Coe did not actually see Abney run the Whites off the road, the incident amply confirms Coe's assessment of the nature and risks to others posed by Abney's conduct.

Even the Green Farm Road collision between Abney's motorcycle and Deputy Coe's patrol car did not stop Abney. He instead continued to flee, running two stop signs. At the first, Abney not only refused

to stop but also illegally passed a vehicle that was stopped at the sign. The driver of the vehicle, Linda Flecken, testified that, while she was stopped "a motorcycle c[a]me flying around [her], cross[ed] the yellow line, into the other lane of traffic, [and] pulled out." At the second stop sign, other witnesses testified that Abney pulled "straight into" traffic, causing several vehicles to slow down quickly. When Deputy Rozier attempted to stop Abney by placing his vehicle and his person directly in front of the motorcycle, Abney again refused to pull over. Instead, Abney swerved around Deputy Rozier and sped away.

To review the record is to conclude that Abney's August 3, 2001 driving behavior put other motorists at substantial risk of serious harm. There is abundant and uncontradicted evidence supporting Deputy Coe's conclusion that Abney's driving over the course of the eight-mile pursuit "was a danger for the life of others." It was, therefore, eminently reasonable to terminate the chase in order to avoid further risks to the lives of innocent motorists.

The Supreme Court held as much in *Scott v. Harris*, 127 S. Ct. 1769 (2007). In that case, the Court concluded that an officer's "attempt to stop a fleeing motorist from continuing his public-endangering flight by ramming the motorist's car from behind" was consistent with the Fourth Amendment. *Id.* at 1772. In *Scott*, a county deputy attempted to pull over Victor Harris for speeding. *Id.* Harris repeatedly refused to pull over and, unable to stop the suspect, Deputy Scott bumped Harris's vehicle. *Id.* at 1773. As a result, Harris lost control, crashed, and was gravely injured. *Id.* He then brought suit against Deputy Scott under 42 U.S.C. § 1983 alleging a violation of his Fourth Amendment rights to be free from unreasonable seizures. *Id.*

The Eleventh Circuit denied Deputy Scott's motion for summary judgment. *Harris v. Coweta County*, 406 F.3d 1307 (11th Cir. 2005). That court concluded that Deputy Scott was not entitled to qualified immunity because a reasonable juror could conclude that the deputy's attempt to terminate the chase by forcing Harris off the road constituted "deadly force" and was therefore unreasonable. *Id.* at 1315.

The Supreme Court reversed. It had "little difficulty in concluding it was reasonable for Scott to take the action that he did," *Scott*, 127

S. Ct. at 1778, and "la[id] down [the] sensible rule" that "[a] police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death," *id.* at 1779.

This case is similar to *Scott*. Indeed, plaintiff's opening brief stated as much: "The *Harris* case is very similar to this matter." In both cases, a motorist refused to stop for police after committing a routine traffic violation; the police pursued the motorist; the motorist employed various tactics to escape capture thereby endangering other motorists and bystanders; a law enforcement officer terminated the chase; and the motorist was injured. The fact that, unlike Scott, Abney did not accelerate to 85 miles-per-hour is not dispositive; indeed, the narrow, winding, two-lane roads in this case all but prohibited such speeds. The fact that Abney was driving during the day and Harris "in the dead of the night," *Scott*, 127 S. Ct. at 1775, means only that Abney had the opportunity to scare more motorists to death. Similarly, the fact that Abney was driving a motorcycle, rather than a car, does not require a different result since the probability that a motorist will be harmed by a Precision Intervention Technique is high in either circumstance. *See Scott*, 127 S. Ct. at 1778 (holding that although Deputy Scott clearly "posed a high likelihood of serious injury or death to [Harris]" that risk was justified by the possibility that innocent bystanders or motorists might be killed).

In accordance with *Scott v. Harris*, 127 S. Ct. 1769 (2007), we hold that Deputy Coe's "attempt to terminate a dangerous . . . car chase that threaten[ed] the lives of innocent bystanders d[id] not violate the Fourth Amendment, even [though] it place[d] the fleeing motorist at risk of serious injury or death." *Id.* at 1779. Because we hold that Deputy Coe's conduct was reasonable, plaintiff cannot prevail, *see Jones v. Buchanan*, 325 F.3d 520, 526 (4th Cir. 2003), and we need not address whether Deputy Coe was entitled to qualified immunity for a constitutional violation.

## IV.

Plaintiff nonetheless contends that — *Scott v. Harris* notwithstanding — "Deputy Coe's actions were not objectively reasonable," but

"unjustified and unwarranted." In plaintiff's view, Deputy Coe is not entitled to judgment because (A) Deputy Coe's actions were unnecessary — the officer could simply have let Abney go; (B) It is a violation of Randolph County Sheriff's Department policy to use precision intervention techniques to halt a fleeing motorist; and (C) Eyewitness testimony creates "genuine issues of material fact . . . with respect to whether Deputy Coe acted reasonably." We find these contentions to be without merit.

### A.

Plaintiff first argues that a precision intervention tactic was unnecessary because Deputy Coe had obtained Abney's license plate number and could have tracked him down at a later date. According to plaintiff, concern for the safety of other motorists did not justify stopping Abney. Any risk to other motorists caused by Abney's driving would have been eliminated if the police had simply abandoned the chase and let Abney go.

We doubt that upon cessation of Coe's pursuit Abney would have been transformed into a model driver. Indeed, Deputy Coe *began* pursuing Abney *because* Abney was driving dangerously: When Coe first observed Abney, the motorcyclist had just passed three or four cars on a curve against the double yellow lines. The driver of the first car estimated Abney's speed at ten to fifteen miles per hour over the posted limit and testified that she was "literally scared to death." In sum, Abney's disregard for the rules of the road and lack of concern for the lives of fellow motorists needed no catalyst: Abney drove recklessly before anyone was giving chase. And, even assuming that a post-chase Abney would have driven safely, there is no reason to believe that Abney would have seen Deputy Coe's abandonment of the chase as a true abandonment rather than the employment of a new pursuit tactic. *See Scott*, 127 S. Ct. at 1779. Abney had in fact already lost Deputy Coe once — only to have the deputy reappear and resume his pursuit.

As *Scott* made clear, an officer's decision whether to let a suspect go in the hopes of catching him later is not governed by just how dangerous the suspect can make the pursuit. *Id.* To require an officer to end a chase whenever the suspect creates a sufficiently great risk to

others is but an invitation to rash conduct. *See id.* There is, of course, no Fourth Amendment right to "impunity-earned-by-recklessness." *Id.*

Plaintiff's claim that the police should just have let Abney go amounts to an exhortation to let crime claim its victims. It also ignores the fact that Deputy Coe was faced with a dreadful choice. There are high costs to the use of intervention tactics to terminate a police pursuit: such tactics can place fleeing suspects at risk of serious harm — as the loss of human life here sadly illustrates. But the costs of inaction are also great: If innocent motorists, like the White family, had been the ones to lose their lives, that too would have been a tragedy. In such circumstances, it is "appropriate . . . to take into account not only the number of lives at risk, but also their relative culpability." *Scott*, 127 S. Ct. at 1778. It was, after all, Abney "who intentionally placed himself and the public in danger by unlawfully engaging in the reckless . . . flight that ultimately produced the choice between two evils that [Deputy Coe] confronted." *Id.*

Plaintiff's suggestion that Deputy Coe should have done this or should have done that fails for an additional reason. Those who were not on Old Country Farm Road should be cautious in applying the very hindsight analysis which the Supreme Court has disfavored. It is fundamental that "[a]n officer's use of force is 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Milstead*, 243 F.3d at 163 (quoting *Graham*, 490 U.S. at 396). We thus decline plaintiff's invitation to second-guess the reasonableness of Deputy Coe's conduct based on what plaintiff later argues may have been a preferable course of action. *See Gooden*, 954 F.2d at 965.

## B.

Plaintiff next claims that Deputy Coe's conduct was unreasonable because the Randolph County Sheriff's Department policy in effect in 2001 "strictly prohibited" "striking a fleeing vehicle to terminate a police chase"; because Sheriff Hurley testified that the intentional bumping of a fleeing suspect's vehicle constitutes excessive force; and because Deputy Coe himself believed that using an intervention tactic to stop Abney would have been excessive.

We are not persuaded. To begin with, the fact that the Randolph County Sheriff's Department may, as a matter of general policy, forbid precision intervention techniques says nothing about whether such tactics are constitutional. It is, in fact, settled law that a violation of departmental policy does not equate with constitutional unreasonableness. *See Davis v. Scherer*, 468 U.S. 183, 193-96 (1984). Thus, the fact that Randolph County deputies are discouraged from using intervention techniques is irrelevant to the question of whether Deputy Coe's conduct was consistent with the Fourth Amendment: The touchstone of that inquiry is reasonableness. *See Scott*, 127 S. Ct. at 1773 n.1 ("It is irrelevant to our analysis whether Scott had permission to take the precise actions he took.").

So too for Sheriff Hurley and Deputy Coe's views that, assuming Deputy Coe had intentionally terminated the pursuit of Abney, such conduct would constitute excessive force under the Fourth Amendment. These *subjective* beliefs as to the reasonableness of an intervention technique are as irrelevant to the constitutional inquiry as the Randolph County policy which prohibited such conduct (and perhaps formed the basis for Deputy Coe's views). Indeed, an officer's subjective belief that a particular use of force was unreasonable is no more proof of a constitutional violation than an officer's subjective belief that a particular use of force was reasonable is proof of constitutionality; the test is one of objective reasonableness. *See, e.g.*, *Brigham City v. Stuart*, ___ U.S. ___, 126 S. Ct. 1943, 1948 (2006); *Bond v. United States*, 529 U.S. 334, 338 n.2 (2000).

### C.

Finally, plaintiff argues that minor differences in eyewitness testimony reveal "genuine issues of material fact" "with respect to whether Deputy Coe acted reasonably." Plaintiff relies upon, for example, the testimony of one eyewitness who "didn't even realize Mr. Abney was being chased"; Deputy Rozier's testimony that he "did not feel threatened" when Abney drove around him; and the testimony of other witnesses whose description of the collision on Mount Shepherd Road in some way differs from the account given by Deputy Coe.

It is, however, elementary that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise prop-

erly supported motion for summary judgment." *Scott*, 127 S. Ct. at 1776 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Rather, to withstand summary judgment, a plaintiff must identify a *genuine* dispute of *material* fact. *See* Fed. R. Civ. Proc. 56(c); *Anderson*, 477 U.S. at 247-48; *Harleysville Mutual Ins. Co. v. Packer*, 60 F.3d 1116, 1120 (4th Cir. 1995). It is not realistic to expect every eyewitness to recall events identically or for every recollection to mesh in every detail. The reality is that eyewitnesses in fact see different things; they do not always share the same vantage point or temporal window into an event. As a result, "[i]t will nearly always be the case that witnesses . . . differ over what occurred." *Gooden*, 954 F.2d at 965.

It is especially unrealistic to expect identical accounts of a long police pursuit. Such chases are by nature dynamic events in which a fleeing suspect attempts often dangerously to evade capture. Changes in speed, road conditions, neighborhoods, traffic patterns, flight strategy, or intervention tactics are just a few of the many variables that can make one witness account of a chase differ from another. Thus the fact that a witness might testify to a moment of apparent control over the course of an eight-mile chase is hardly remarkable.

For precisely these reasons, the inevitable difference in witness testimony does not always "signify a difference of triable fact." *Id.* To demand perfect seamlessness in such testimony is to insist upon the impossible. In the case at hand, while there may be genuine disputes, they are not over material facts; and while there may be disputes over material facts, they are not genuine. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This long chase was punctuated by traffic violation piled upon traffic violation as Abney repeatedly employed reckless maneuvers to elude the police. An officer could certainly conclude that Abney's erratic driving behavior (ignoring curves, double yellow lines, stop signs, a police vehicle, oncoming traffic, and flashing blue lights and sirens) placed innocent motorists at risk of, among other things, head-on collisions.[2]

---

[2]Plaintiff's state claims against Deputy Coe for gross negligence and wrongful death fail for the same reasons noted above. North Carolina law

Thus, the judgment of the district court must be reversed and the case remanded for entry of judgment for defendant.

*REVERSED*

---

sets a high bar for such relief: "North Carolina's standard of gross negligence, with regard to police pursuits, is very high and is rarely met." *Eckard v. Smith*, 603 S.E.2d 134, 142 (N.C. 2004). Gross negligence is defined as "wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Bullins v. Schmidt*, 369 S.E.2d 601, 603 (N.C. 1998); *see also Parish v. Hill*, 513 S.E.2d, 547 551-52 (N.C. 1999) (gross negligence requires, at a minimum, "reckless indifference to the rights of others"). And, in North Carolina, a claim for wrongful death "exists if and only if the decedent could have maintained an action for negligence or some other misconduct if [ ]he had survived." *Nelson v. United States*, 541 F. Supp. 816, 818 (M.D.N.C. 1982); *see* N.C. Gen. Stat. § 28A-18-2 (2005).

For the reasons explained above, plaintiff has failed to present evidence that Deputy Coe's actions were unreasonable, much less "wanton" acts of "reckless disregard for the rights and safety of others." *See Bullins*, 369 S.E.2d at 603. Accordingly, plaintiff's claims for gross negligence and wrongful death are meritless, and the case must be dismissed.