People v Baldner (2024 NY Slip Op 04495)

People v Baldner

2024 NY Slip Op 04495

Decided on September 19, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:September 19, 2024

CR-23-0654
[*1]The People of the State of New York, Appellant,
v
Christopher Baldner, Respondent.

Calendar Date:April 25, 2024

Before:Egan Jr., J.P., Aarons, Fisher, McShan and Mackey, JJ.

Letitia James, Attorney General, New York City (Matthew B. Keller of counsel), for appellant.
Larkin Ingrassia LLP, Newburgh (John Ingrassia of counsel), for respondent.

Aarons, J.
Appeal from an order of the County Court of Ulster County (Bryan E. Rounds, J.), entered February 2, 2023, which, among other things, partially granted defendant's motion to dismiss the indictment.
On two separate occasions — once in September 2019 and once in December 2020 — defendant, an on-duty state trooper, engaged in high-speed chases with vehicles traveling on Interstate 87 (hereinafter the Thruway) in Ulster County. Both chases ended when defendant collided with the vehicles from behind, forcing them off the road. One of those vehicles flipped over and landed upside down, and a passenger inside the vehicle died. She was 11 years old.
The Attorney General commenced an investigation, culminating in an indictment charging defendant with one count of murder in the second degree (depraved indifference murder), one count of manslaughter in the second degree and six counts of reckless endangerment in the first degree. Defendant filed an omnibus motion contending, as relevant here, that the evidence before the grand jury was not legally sufficient to establish that defendant acted with depraved indifference to human life as required by the crimes of depraved indifference murder and first-degree reckless endangerment. County Court agreed and dismissed the count of depraved indifference murder and reduced the counts of first-degree reckless endangerment to reckless endangerment in the second degree. The People appeal.
Depraved indifference is a culpable mental state that is "best understood as an utter disregard for the value of human life — a willingness to act not because one intends harm, but because one simply does not care whether grievous harm results or not" (People v Williams, 206 AD3d 1282, 1284 [3d Dept 2022] [internal quotation marks, brackets and citations omitted]; see People v Huntington, 57 AD3d 1238, 1239 [3d Dept 2008]). "A person is guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to human life, he [or she] recklessly engages in conduct which creates a grave risk of death to another person" (Penal Law § 120.25). A person is guilty of depraved indifference murder if, by that same conduct, the person "causes the death of another person" (Penal Law § 125.25 [2]). Thus, depraved indifference is an essential element of both crimes that "has meaning independent of recklessness and the gravity of the risk created" (People v Maldonado, 24 NY3d 48, 53 [2014] [internal quotation marks and citation omitted]; see Penal Law §§ 120.25; 125.25 [2]; People v Lewie, 17 NY3d 348, 359 [2011]; People v Feingold, 7 NY3d 288, 294-295 [2006]; see also Penal Law § 15.05 [3]).
Depraved indifference requires a "highly fact-specific" inquiry (People v Heidgen, 22 NY3d 259, 276 [2013]), and, in assessing the legal sufficiency of evidence before the grand jury, "[o]ur task is limited to assessing whether the facts, if proven, and the inferences that logically flow from those facts supply proof of [*2]every element of the charged crimes" (People v Reid, 185 AD3d 1163, 1165 [3d Dept 2020] [internal quotation marks and citations omitted]). Critically, the "reviewing court must consider whether the evidence viewed in the light most favorable to the People, if unexplained and uncontradicted, would warrant conviction by a petit jury" (People v Edwards, 36 NY3d 946, 947 [2020] [internal quotation marks and citations omitted]; accord People v Hart, 221 AD3d 1192, 1193 [3d Dept 2023]). "In the context of grand jury proceedings, legal sufficiency means prima facie proof of the crimes charged, not proof beyond a reasonable doubt" (People v Park, 163 AD3d 1060, 1061 [3d Dept 2018] [internal quotation marks and citations omitted]; see CPL 70.10 [1]).
The grand jury heard that, in September 2019, defendant "came out of the woods like the Dukes of Hazard" in his State Police vehicle, sirens activated, when he observed a minivan speeding at 80 miles per hour. Jonathan Muthu, the minivan's driver, testified that there were two passengers with him — a friend who had travelled with him from New York City to the Albany area earlier that morning and an acquaintance Muthu agreed to transport from Albany back to New York City. Muthu admitted that he fled the ensuing traffic stop because he had marihuana in the minivan, and accelerated to 70 to 80 miles per hour while "trying to go around cars." After Muthu failed to pull over again, defendant hit the rear of the minivan with his State Police vehicle while the minivan was traveling at "highway speed." The collision caused the minivan to spin 180 degrees, leave the roadway and hit the guardrail in the median. Defendant then crashed his State Police vehicle head-on into the front of the stationary minivan with Muthu and his two passengers still inside. The minivan was totaled, Muthu said, and the State Police vehicle appeared to sustain heavy damage too. Defendant then pointed his gun at Muthu and the two passengers and ordered them outside to lie on the ground, repeatedly asking whether they had weapons or drugs but never whether anyone was hurt.
Muthu also testified to defendant's statements to him after he was taken into custody. As recounted by Muthu, defendant said he was "lucky" that the "pit maneuver" succeeded in stopping the minivan, because otherwise defendant would have had tire spikes thrown onto the Thruway. Further, defendant told Muthu there is "only one way in and one way out" of the Thruway and wondered, "Where did you think you were going to go?"
By contrast, defendant's contemporaneous memorandum concerning the 2019 incident indicates the minivan had been traveling at 90 miles per hour before the attempted traffic stop, and then was "weaving in and out of traffic[,] slowing and speeding up to speeds over 100 mph." According to that memorandum and testimony from defendant's shift supervisor, defendant reported that the minivan initiated contact with the passenger side of defendant's State Police vehicle[*3], causing the minivan to lose control and crash into the median guardrail. Defendant further reported that he positioned his State Police vehicle in front of the minivan after it hit the guardrail, and the minivan drove into the front end of defendant's vehicle attempting to flee again.
The evidence of the December 2020 incident follows a similar pattern. The grand jury heard from witnesses that, around 11:40 p.m., defendant was "see[ing] if he could get one last ticket" before meeting his partner when he stopped an SUV for speeding. The SUV pulled over, and, as told by Tristin Goods, who was driving the SUV, along with Goods' wife, who was seated in the front passenger seat, defendant began the traffic stop by angrily and profanely accusing Goods of traveling over 100 miles per hour. An argument between defendant and Goods ensued in front of Goods' wife and two children, who tried to calm him. Witnesses testified that, after defendant stepped away upon Goods' request to summon a supervisor, defendant returned and, without warning or provocation, pepper-sprayed the passenger cabin of the SUV, and Goods' wife and two children began screaming in pain. Goods, who had shielded his eyes from the spray, fled the traffic stop; in the commotion, defendant's pepper spray canister ended up inside the passenger cabin of the SUV.
Defendant radioed that the SUV was "taking off" with his pepper spray. According to the grand jury record, defendant pursued and caught up to the SUV and, without activating his siren, intentionally rammed the back of the SUV at 130 miles per hour. Defendant radioed dispatch, however, that the SUV had "just f***ing rammed me." The collision caused the SUV to fishtail, and pieces of it fell onto the road. The SUV continued on, so defendant intentionally rammed the back of the SUV again, this time at 100 miles per hour. Defendant radioed dispatch that the SUV "rammed me again."

The second collision caused Goods to lose control of the SUV, and the SUV flipped over, coming to a stop upside down in the grass next to the Thruway with Goods, his wife and two children inside. Defendant, seeing this, radioed that a car was overturned.[FN1] Testimony established that defendant drew his gun, instructed the occupants of the SUV to put their hands out of the windows and asked repeatedly whether they possessed weapons or drugs. Defendant did not inquire if anyone inside was injured in the crash and, when Goods' 11-year-old child could not be located, defendant did not assist him in looking for her. According to Goods, who had sustained arm, hand and head injuries, defendant "did not care." The child was later found pinned inside the wreck of the SUV, having already died from severe injuries sustained in the accident.
Meanwhile, as emergency responders engaged in recovery efforts, testimony and video evidence revealed that defendant searched for and found his pepper spray can. According to another trooper at the scene who asked defendant how he was [*4]doing, defendant said he felt "fine" except for the pepper spray that had blown back on him when it was discharged. Defendant reported to a State Police sergeant that both collisions were initiated by the SUV, including the second one, which caused the SUV to lose control and crash.
Although "the mens rea of depraved indifference will rarely be established by risky behavior alone" (People v Maldonado, 24 NY3d at 53), intentionally colliding with occupied vehicles traveling 70 to 100 miles per hour comes close (see People v Williams, 162 AD3d 694, 696-697 [2d Dept 2018], lv denied 32 NY3d 942 [2018], cert denied ___ US ___, 139 S Ct 847 [2019]; People v Garrow, 75 AD3d 849, 851 [3d Dept 2010]; see also People v Heidgen, 22 NY3d at 277; cf. People v Herrera, 202 AD3d 517, 518 [1st Dept 2022], lv denied 38 NY3d 1134 [2022]). Viewed in the light most favorable to the People (see People v Edwards, 36 NY3d at 947), the grand jury could rely on testimony and evidence indicating that, after both incidents, "defendant exhibited no signs of remorse for the results of his recklessness" as proof that he hit the minivan in 2019 and the SUV in 2020 with an utter disregard for the value of the human lives within them (People v Williams, 162 AD3d at 697; see People v Williams, 206 AD3d at 1284, 1288; People v Nelligan, 135 AD3d 1075, 1078 [3d Dept 2016], lv denied 27 NY3d 1072 [2016]; see also People v Barboni, 21 NY3d 393, 402 [2013]). As to the 2019 incident, the grand jury could infer that defendant — aware that the minivan could not have evaded him given the Thruway's one-way-in, one-way-out design — "simply [did not] care whether grievous harm result[ed]" from colliding with the occupied minivan from behind given testimony that defendant's very next act was to crash into it again from the front, later expressing that Muthu was lucky the so-called pit maneuver worked (People v Williams, 206 AD3d at 1284 [internal quotation marks and citations omitted]; see People v Suarez, 6 NY3d 202, 214 [2005]). Similarly, as to the 2020 incident, the grand jury could infer that defendant saw the SUV falling apart all over the road after he rammed it the first time at 130 miles per hour, permitting the grand jury to find that defendant — aware that the SUV still contained a family of four, including two children, all of whom he had just pepper-sprayed — was callously indifferent to the predictably tragic consequences of ramming it a second time at 100 miles per hour (see People v Wilson, 32 NY3d 1, 7 [2018]; People v Barboni, 21 NY3d at 403-404).
Additionally, State Police witnesses testified that, even though vehicle contact is listed in the agency's pursuit manual, it is an "extreme measure" that troopers are not trained to do. As a result, witnesses told the grand jury, the tactic should only be employed with supervisor approval — which the evidence showed defendant never obtained — or in "extraordinary" or "life-threatening" circumstances — which the grand jury could [*5]find did not exist.[FN2] Remaining mindful that "[t]rying to cover up a crime does not prove indifference to it" (People v Lewie, 17 NY3d at 360), in our view, proof tending to show that defendant was avoiding supervisory scrutiny and fabricating a record in real time to justify the brutal act of intentionally crashing his State Police vehicle into two occupied civilian vehicles at high speed supports an inference that he did so because of wanton cruelty and a contemptuous disregard for whether the occupants of those vehicles lived or died (cf. People v Williams, 150 AD3d 1273, 1278 [2d Dept 2017], lv denied 29 NY3d 1135 [2017]; compare People v Lewie, 17 NY3d at 359-360). Although innocent inferences could also be drawn from the evidence presented, the People's proof was legally sufficient to support the grand jury's finding that defendant exhibited depraved indifference toward the occupants of the minivan and SUV (see People v Edwards, 182 AD3d 929, 931 [3d Dept 2020], affd 36 NY3d 946 [2020]; People v Williams, 162 AD3d at 697).
Defendant nevertheless contends that he cannot have acted with depraved indifference because, in the context of federal civil rights lawsuits, police officers were held not liable because their injury-causing collisions with fleeing vehicles were found objectively reasonable under the circumstances (see Scott v Harris, 550 US 372, 383-384 [2007]; Christiansen v Eral, 52 F4th 377, 380 [8th Cir 2022]; Pasco ex rel. Pasco v Knoblauch, 566 F3d 572, 581 [5th Cir 2009]; Sharp v Fisher, 532 F3d 1180, 1184 [11th Cir 2008]; Abney v Coe, 493 F3d 412, 418 [4th Cir 2007]). This point misses the mark, as "it is not the circumstances under which the [criminal conduct] occurred that determines whether defendant is guilty of depraved indifference [crimes], but rather defendant's mental state at the time the crime[s] occurred" (People v Jean-Baptiste, 11 NY3d 539, 542 [2008]; see People v Prindle, 16 NY3d 768, 770 [2011]; People v Feingold, 7 NY3d at 294-295).
In a similar vein, the dissent's conclusion that defendant cannot be charged with depraved indifference crimes because he was trying to protect the public from dangerous high-speed chases flows from a misapplication of the standard of review. To summarize the relevant grand jury evidence, Muthu testified that he was trying to avoid other vehicles during the chase and was going 70 to 80 miles per hour in the correct direction on the Thruway. Goods was pulled over close to midnight, suggesting there were few other cars on the Thruway when he sped away after defendant allegedly pepper-sprayed his wife and two children for no reason. In neither chase did defendant report that other drivers were endangered or request permission to initiate vehicle contact despite having the opportunity and mandate to do so. Indeed, the record fairly implies defendant concealed or falsely reported the details of both chases as they occurred and in their immediate aftermaths. Accordingly, the grand jury could [*6]reject the dissent's view that defendant acted out of concern for the public. Rather, the finding permitted when the evidence is viewed in the light that most favors the People — which is the finding that we must credit in this posture (see People v Edwards, 36 NY3d at 947; People v Hart, 221 AD3d at 1193) — is that defendant decided to end both pursuits with perilous, unsanctioned high-speed collisions while possessed of a "wickedness, evil or inhumanity" directed at two defiant drivers and the friends and family who happened to be with them (People v Suarez, 6 NY3d at 214; see People v Williams, 162 AD3d at 696-697 [a defendant who chased potential victim at high speed and fired a gun at her vehicle, causing her to lose control of the vehicle and crash, exhibited depraved indifference]).
Evidence that defendant braked during the 2020 incident an instant before striking the SUV the second time does not compel dismissal of the depraved indifference murder count and reduction of the relevant reckless endangerment counts. The People's expert opined that, according to the data retrieved from the State Police vehicle, defendant was traveling alongside the SUV when he applied the brake, rapidly slowing from 114 to 100 miles per hour, which the expert characterized as an "emergency" or "hard" brake. The expert also testified that, around the same time, defendant turned his vehicle toward the SUV, which was inconsistent with an avoidance maneuver (see People v Edwards, 182 AD3d at 930). Given this context, the grand jury reasonably understood the expert to mean that defendant braked in order to position his State Police vehicle to intentionally ram the SUV (compare People v Williams, 206 AD3d at 1288-1289).
With respect to the 2019 incident, defendant asserts that we should affirm reduction of the relevant counts because the evidence was not legally sufficient to prove he "creat[ed] a grave risk of death" to Muthu and his two passengers (Penal Law § 120.25). County Court appears to have agreed because it concluded that defendant "ignored — and created — multiple perils that presented, at a minimum, a grave risk of physical danger to" the three occupants of the minivan, which would support a charge of second-degree reckless endangerment (see Penal Law § 120.20). Without belaboring the point, the evidence before the grand jury indicating that defendant intentionally collided with an occupied minivan traveling at "highway speed," spinning it 180 degrees and sending it off the road, across a median and into a guardrail, is legally sufficient to sustain the counts of the indictment charging defendant with first-degree reckless endangerment (see Penal Law § 120.25; People v Garrow, 75 AD3d at 851).
The People's remaining contentions are academic.
Fisher, McShan and Mackey, JJ., concur.
Egan Jr., J.P. (dissenting).
I am mindful that an 11-year-old child, Monica Goods, tragically lost her life on the evening of December 22, 2020, when the vehicle in which [*7]she was a back seat passenger was involved in a high-speed pursuit and collision with a State Police vehicle operated by defendant. Because I believe that County Court correctly modified the indictment by dismissing and reducing portions of it, I respectfully dissent.
With this preface, the grand jury heard evidence indicating that, on separate occasions in September 2019 and December 2020, defendant, a state trooper, disregarded State Police procedures in pursuing vehicles on the Thruway after their drivers fled attempted traffic stops. He then made contact with the vehicles in the rear bumper in an apparent effort to end the chases. State Police protocols did not authorize defendant to make contact with the vehicles absent a supervisor's approval — which he did not have — and the evidence reflected that such a maneuver was generally only executed at low to moderate speeds given the risk of injury to the occupants of the vehicle that was being pursued.
Viewing that evidence in the light most favorable to the People, the grand jury could readily conclude that defendant acted recklessly in both incidents by executing unauthorized maneuvers to end the chases and placing the occupants of the vehicles he was pursuing at risk of death, and it could therefore hand up an indictment charging offenses requiring that state of mind. That said, all high-speed chases involve "driv[ing] in what is generally considered a reckless manner," as the drivers "violate accepted rules of the road" and, in so doing, create "the potential for grave injuries and fatalities" for both themselves and innocent bystanders (People v Maldonado, 24 NY3d 48, 57-58 [2014]). "[R]eckless driving does not, on its own, establish the . . . mens rea of depraved indifference" (id. at 55). More was required and, as I agree with County Court that the People failed to present proof to the grand jury establishing it, the court properly dismissed and/or reduced the charges in the indictment requiring a showing of depraved indifference.
Depraved indifference is not merely the "conscious disregard of a known risk" of death or injury that constitutes recklessness (People v Lewie, 17 NY3d 348, 358 [2011]); it "is something even worse" (id. at 359). Depraved indifference is "a culpable mental state . . . [that] is best understood as an utter disregard for the value of human life — a willingness to act not because one intends harm, but because one simply [does not] care whether grievous harm results or not" (People v Heidgen, 22 NY3d 259, 274 [2013] [internal quotation marks and citations omitted]; see People v Edwards, 36 NY3d 946, 947 [2020]; People v Maldonado, 24 NY3d at 52-53; People v Williams, 206 AD3d 1282, 1284 [3d Dept 2022]). "In other words, a person who is depravedly indifferent is not just willing to take a grossly unreasonable risk to human life — that person does not care how the risk turns out" and will shed no tears if the risk is realized and others end up injured or dead (People [*8]v Lewie, 17 NY3d at 359). It is an exceptionally rare situation where someone exhibits such a callous disregard for others, and those cases involve "wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts,
. . . conduct . . . so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy as to render the actor as culpable as one whose conscious objective is to kill" (People v Suarez, 6 NY3d 202, 214 [2005] [internal quotation marks and citation omitted]; see People v Williams, 206 AD3d at 1284).
The proof before the grand jury reflected that defendant had valid grounds for stopping the vehicles involved in both the September 2019 and December 2020 incidents, both of which he had observed traveling well over the posted speed limit, and that the ensuing chases would not have occurred had the drivers of the other vehicles simply seen a routine traffic stop through to its conclusion. The September 2019 incident involved the driver of a Dodge Grand Caravan who initially stopped but, after defendant got out of his troop car and began to approach, fled out of concern that defendant would discover the marihuana in the vehicle. The driver accelerated over the speed limit to 70 or 80 miles per hour and defendant, who had gotten back into his troop car, caught up. After the driver had been "trying to go around cars" in an unspecified fashion, defendant made contact with the Grand Caravan, causing it to run into the guardrail and come to a stop. Defendant then drove into the front bumper of the Grand Caravan as it came to rest on the side of the road, presumably to prevent the driver from trying to flee again, and ordered everyone out of the vehicle at gunpoint and directed them to lay face down on the grass so that he could check the vehicle. Defendant later told the driver that he was "lucky" that the maneuver worked, because defendant would have had tire spikes thrown across the road to bring the chase to a conclusion if it had not.
As for the December 2020 incident, defendant stopped a Dodge Journey for speeding, and the driver of that vehicle pulled over and admittedly engaged in a verbal confrontation with defendant. The driver eventually demanded to speak to defendant's supervisor, at which point defendant walked back to his troop car. When he returned, he asked if the driver even had a driver's license. The driver declined to reply, but the driver's wife said that he did. The testimony reflected that defendant then pepper sprayed the driver and the other occupants of the Journey. At that point, the driver took off and accelerated to what the evidence reflected was 110 miles per hour. Defendant gave chase and accelerated to approximately 130 miles per hour in order to catch up with the vehicle. He then made contact with the rear of the Journey twice, causing the vehicle to spin off the road, flip over and land on its roof. Defendant approached the Journey with [*9]his gun drawn, directed the occupants to remain inside and demanded to know if there were any weapons or drugs in the vehicle. He did not ask if the occupants were all right or assist them, but there was also no question that defendant was in contact with dispatch throughout the chase and that someone summoned medical assistance that arrived within a few minutes.
In my view, the foregoing evidence, if accepted as true, reflects that defendant was doing his job in a reckless and undisciplined fashion during the September 2019 and December 2020 incidents. It does not permit the conclusion that defendant evinced an utter disregard for human life in either. Defendant made justified traffic stops in September 2019 and December 2020, attempting to pull over drivers who were going over the speed limit and, in so doing, placing themselves and other motorists on the road in danger. Regardless of whether defendant's use of pepper spray to subdue an admittedly argumentative driver in the December 2020 incident was justified, the use of a nonlethal chemical spray does not suggest the "utter disregard for the value of human life" required for depraved indifference (People v Heidgen, 22 NY3d at 274 [internal quotation marks and citations omitted]). Defendant pursued both drivers at high speed, but there is no indication that such was due to anything other than the decision of the drivers themselves to travel at a high rate of speed. Moreover, while defendant's decision to make contact with the vehicles to end both chases may well have been reckless and in violation of State Police procedures, a reckless effort to protect the public by stopping a dangerous chase can in no way be compared to the decision of a driver to continue one and behave in such a manner as to place the public at risk (see e.g. People v Heidgen, 22 NY3d at 277 [defendant engaging in "a high speed game of chicken" on road exhibited depraved indifference to human life]; People v Herrera, 202 AD3d 517, 517-518 [1st Dept 2022], lv denied 38 NY3d 1134 [2022] [defendant recklessly driving in wrong lane of traffic while fleeing police exhibited depraved indifference]; People v Williams, 162 AD3d 694, 696-697 [2d Dept 2018], lv denied 10 NY3d 940 [2008] [drug dealer who chased potential victim at high speed and fired a gun at her vehicle exhibited depraved indifference]). Attempting to end a dangerous high-speed chase, even if accomplished in a manner that places the occupants of the fleeing vehicle at risk, "permits only the inference that defendant, while reckless, consciously avoided risk, which 'is the antithesis of a complete disregard for the safety of others' " (People v Williams, 206 AD3d at 1288, quoting People v Maldonado, 24 NY3d at 54). That conclusion is in no way impacted by defendant's failure to evince concern for the occupants of either vehicle after they left the road; his actions in blocking the Grand Caravan, as well as his demanding to know if there were weapons in either vehicle[*10], reflect little beyond his need to ensure his safety as he approached vehicles whose occupants had, to reiterate, just elected to flee lawful traffic stops at high rates of speed. Thus, as County Court determined, the proof before the grand jury does not support a finding that defendant acted with the requisite depraved indifference to human life.
ORDERED that the order is modified, on the law, by reversing so much thereof as dismissed count 1 of the indictment charging defendant with murder in the second degree and reduced counts 3, 4, 5, 6, 7 and 8 of the indictment from reckless endangerment in the first degree to reckless endangerment in the second degree; motion denied to that extent and such counts reinstated; and, as so modified, affirmed.

Footnotes

Footnote 1: In granting defendant's motion, County Court stated that recordings "reveal defendant's direction to a dispatcher for an EMS response." In their respective briefs, the People represent, and defendant concedes, that this evidence was not before the grand jury. It is therefore beyond the scope of review (see CPL 210.20 [1] [b]).

Footnote 2: Testimony established that state troopers have individual discretion to end a pursuit; thus, contrary to the dissent's reasoning, the grand jury could find that something "other than the decision[s] of the drivers themselves to travel at a high rate of speed" impelled defendant to maintain these "dangerous high-speed chase[s]" (dissenting op at 11).