People v Greene (2025 NY Slip Op 06931)

People v Greene

2025 NY Slip Op 06931

Decided on December 11, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:December 11, 2025

CR-23-1442
[*1]The People of the State of New York, Respondent,
vDequan Greene, Appellant.

Calendar Date:September 9, 2025

Before:Aarons, Fisher, McShan and Mackey, JJ.; Clark, J.P., vouched in.

Paul Skip Laisure, Garden City, for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.

Fisher, J.
Appeal from a judgment of the County Court of Schenectady County (Matthew Sypniewski, J.), rendered December 6, 2022, upon a verdict convicting defendant of the crimes of murder in the second degree, manslaughter in the first degree and endangering the welfare of a child (two counts).
Defendant and his wife were certified foster parents and, in September 2020, began caring for the victim (born in 2016) and his brother (born in 2015) after they were removed from the care of their biological mother. On the afternoon of December 20, 2020, the victim, his brother and the other children in defendant's residence were being cared for by defendant while his wife was out shopping. After the wife returned home, she called 911 at 5:11 p.m. to report that the victim was unconscious and did not appear to be breathing. First responders arrived to find defendant performing CPR on the lifeless victim and, when defendant was asked what had happened, he described how the victim had fallen out of a toddler chair, began slurring his speech and then collapsed. The victim was transported to the hospital, where the efforts to resuscitate him were fruitless and, at 6:38 p.m., he was pronounced deceased.
Defendant's version of events quickly unraveled. Medical providers who treated the victim at the hospital observed bruising on his torso, legs, arms and face, and the police were alerted to those injuries. An autopsy of the victim conducted the next morning revealed that he had died from severe internal bleeding caused by blunt force trauma to the abdomen that lacerated his liver and mesentery.[FN1] Later that day, child protective officials and a police detective who were investigating the victim's death went to defendant's home and retrieved the victim's brother and the other children in the home to interview those old enough to communicate. The officials sent the brother to be examined at a hospital after seeing that he had bruises on his face, a swollen lip and significant marks on his hands. The nurse who conducted that examination documented the extent of the brother's injuries. The brother further described to the nurse how defendant had abused both him and the victim while they were living at defendant's home and how, in particular, defendant had "step[ped] on [his] tummy" in the past and had "jump[ed] on [the victim's] tummy" on the day the victim died.
Defendant was charged in a January 2021 indictment with, as is relevant here, murder in the second degree, manslaughter in the first degree and two counts of endangering the welfare of a child. Following a jury trial, defendant was convicted of those charges. County Court sentenced defendant to concurrent terms of 25 years to life in prison upon the murder conviction and 25 years in prison, to be followed by five years of postrelease supervision, upon the manslaughter conviction. County Court further imposed definite sentences of one year in jail upon each of the endangering the welfare of a child convictions, which [*2]merged by operation of law with the sentences imposed upon the felony convictions, as well as a total of $6,000 in fines relating to the murder conviction and one of the child endangerment convictions (see Penal Law §§ 70.15, 70.35). Defendant appeals.
We affirm. Defendant contends that the murder in the second degree and manslaughter in the first degree convictions are not supported by legally sufficient evidence and are against the weight of the evidence. His legal sufficiency argument is unpreserved because, in the generalized motion to dismiss he offered after the People rested, he failed to identify the specific grounds now raised on appeal (see People v Parker, 240 AD3d 66, 71 [3d Dept 2025], lv denied 43 NY3d 1047 [2025]; People v Osman, 228 AD3d 1007, 1008 [3d Dept 2024]). Having said that, "[h]is argument that the verdict is against the weight of the evidence does not require preservation, . . . and obliges this Court to assess whether each element of the crimes for which he was convicted was proven beyond a reasonable doubt" (People v Diaz, 213 AD3d 979, 980 [3d Dept 2023], lv denied 40 NY3d 928 [2023]; see People v Osman, 228 AD3d at 1008). A weight of the evidence review "involves a two-step approach wherein a court must (1) determine whether, based on all the credible evidence, an acquittal would not have been unreasonable; and (2) weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Sanchez, 32 NY3d 1021, 1023 [2018] [internal quotation marks and citations omitted]).
As relevant here, a person is guilty of depraved indifference murder of a child when, "[u]nder circumstances evincing a depraved indifference to human life, and being [18] years old or more the defendant recklessly engages in conduct which creates a grave risk of serious physical injury or death to another person less than [11] years old and thereby causes the death of such person" (Penal Law § 125.25 [4]; see People v Barboni, 21 NY3d 393, 400 [2013]).[FN2] To prove the requisite mens rea, the People must show both (1) a depraved indifference to human life, and (2) recklessness creating a grave risk of serious physical injury or death (see People v Wilson, 32 NY3d 1, 6 [2018]; People v Barboni, 21 NY3d at 400). Depraved indifference is a culpable mental state that "requires a highly fact-specific inquiry," and "is best understood as an utter disregard for the value of human life — a willingness to act not because one intends harm, but because one simply does not care whether grievous harm results or not" (People v Baldner, 230 AD3d 1434, 1434-1435 [3d Dept 2024] [internal quotation marks and citations omitted], affd 44 NY3d 999 [2025]). To this point, depraved indifference is present, among other circumstances, "where the facts reflect wanton cruelty, brutality or callousness directed against a particularly vulnerable victim, combined with utter indifference to the life [*3]or safety of the helpless target" (People v Nelligan, 135 AD3d 1075, 1078 [3d Dept 2016] [internal quotation marks and citation omitted], lv denied 27 NY3d 1072 [2016]; see People v Williams, 206 AD3d 1282, 1284 [3d Dept 2022]; People v Stahli, 159 AD3d 1055, 1057 [3d Dept 2018], lv denied 31 NY3d 1088 [2018]). Although there is no "exhaustive list of situations in which a defendant may properly be convicted of depraved indifference murder based on a one-on-one killing," it is well established that "[a] brutal course of conduct against a vulnerable victim occurring over a prolonged or extended period of time is more likely to be associated with the mental state of depraved indifference to human life than brutality that is short in duration and is not repeated. This is because the actor had the opportunity to regret his [or her] actions and display caring, but failed to take the opportunity" (People v Barboni, 21 NY3d at 403; accord People v Wilson, 32 NY3d at 9). The requisite callousness to human life may still be found, even if the assaultive conduct that actually caused the victim's injury or death was brief, where the perpetrator subjected the victim to "a prolonged period of" abuse leading up to the final fatal assault and failed to obtain medical care after it occurred (People v Wilson, 32 NY3d at 7; see People v Barboni, 21 NY3d at 402-404; People v Verneus, 184 AD3d 678, 680 [2d Dept 2020]; People v Warrington, 146 AD3d 1233, 1237 [3d Dept 2017], lv denied 29 NY3d 1038 [2017]; People v Nelligan, 135 AD3d at 1077-1078). As to recklessness, a person acts with the culpable state of mind "when he or she is aware of and consciously disregards a substantial and unjustifiable grave risk of death to another person and that the disregard of this risk constitutes a gross deviation from the standard of conduct that a reasonable person would have observed in the situation" (People v Dorvil, 234 AD3d 1106, 1108 [3d Dept 2025] [internal quotation marks, brackets and citations omitted], lv denied 44 NY3d 982 [2025]; see People v Barboni, 21 NY3d at 400).
The evidence at trial demonstrates that the victim and his brother were in the sole care of defendant in the hours before the victim died, and the victim's brother testified as to what he saw during that period. The brother described how, after the victim lied about wetting his pants, defendant made the victim take a cold shower and eat a "nasty" mixture of ketchup, mustard and corn. Defendant then ordered the victim to do a wall sit, which involved pressing his back against a wall and holding a seated position there with his knees bent. The victim failed to perform the wall sit properly, which prompted defendant to force him onto the floor, step on his abdomen and direct him to get up. When the victim replied that he could not do so, defendant repeated the demand. The victim did not answer because, in the brother's words, "[h]e was dead."
Thereafter, according to cell phone records, defendant called his [*4]wife twice, first at 5:07 p.m. and again at 5:08 p.m. as she was seen pulling into their driveway on the surveillance footage from their residence. The wife called 911 at 5:11 p.m., advising the dispatcher that defendant was performing mouth-to-mouth on the victim. In the recorded 911 call, the wife could be heard talking to the victim and, based on instructions from the dispatcher, directed defendant to begin CPR — which he commenced. The first responder to the scene testified that he arrived less than three minutes after the call and entered the residence to find the victim lying lifeless, cold, pale and without a pulse. As other emergency responders arrived, defendant initially told them the victim fell out of a toddler chair and began slurring his words before collapsing, and then advised them that the child may have been choking on food, causing responders to perform both CPR and the Heimlich maneuver. As the victim was being worked on and prepared for transport to the hospital, defendant provided a statement to a detective and, thereafter, spoke in "a very laid-back" manner about his other children, his interest in music and his work.
The proof at trial also included the report describing the victim's autopsy and the testimony of the forensic pathologist who performed it, both of which reflected that the victim bled to death internally as the result of serious abdominal injuries, including a laceration of the liver that "almost [tore] it into two," caused by blunt force trauma. The pathologist testified that this injury caused "extensive hemmorhag[ing]," with almost a third of the victim's blood found in his abdominal cavity during the autopsy, and that the victim would have lost consciousness within minutes after the injury occurred. The pathologist further explained that the "severe compression" of the abdomen and lower chest that could cause such an injury would require "a significant amount of force," describing how he had seen similar injuries in high-speed car crashes where a seat belt compressed a car occupant's abdomen and chest enough to rip through his or her liver. The pathologist accordingly stated that a fall from a toddler chair or life-saving efforts like CPR or the Heimlich maneuver, which defendant suggested as possible causes of the victim's injuries, could not have caused such "terrific" and "unsurvivable" trauma. A "significant stomp" on his stomach from an adult male like defendant, on the other hand, could have accounted for them. Moreover, the pathologist further noted extensive bruising and injuries across the victim's entire body, all presenting in different phases of healing.
The trial evidence further reflected certain findings that were made during the subsequent investigation. Specifically, that the victim and his brother were in good health when they were placed in the care of defendant and his wife in September 2020 but that — as documented by the testimony of individuals who saw or examined the victim and his [*5]brother in December 2020, the medical records of the victim and his brother, and photographs of their injuries — both were covered in bruises and abrasions by the time the victim died three months later. According to a nurse examiner, a physical examination of the victim's brother revealed various bruises which were consistent with blunt force trauma. Between the testimony of the nurse examiner and the brother, the proof reflected that the bruises and injuries were the product of abuse by defendant, including that defendant also had stepped on the brother's abdomen to punish him and how defendant would grab him hard enough to leave bruises. The brother further testified to other conduct reflecting that defendant had little concern about their welfare and may have even enjoyed tormenting them, such as how defendant would put them in "time out" by making them sit in a chair for prolonged periods of time and then pour water on their heads to wake them up if they began to nod off, while filming the ordeal. The brother also described how, apart from making the victim eat the "nasty corn" mixed with ketchup and mustard for punishment, defendant frequently gave the siblings different food from that offered to the other children in the home. The People presented evidence at trial further suggesting that defendant and his wife went out of their way to cover up that conduct. For instance, testimony revealed that they made up various excuses to cancel appointments and visits in November and December 2020 when foster care officials would have seen the victim and his brother and potentially detected the abuse, most notably by claiming on one occasion that the entire household was in COVID-19 quarantine after an out-of-state family vacation during that period, despite the fact that defendant went back to work immediately upon his return from that vacation. Moreover, the trial evidence included a text message sent less than three weeks before the incident from the wife's cell phone to defendant, cautioning that there were to be "[n]o more bruises" because "[w]e need them to heal." Another time, in response to a video of him pouring water over the boys, defendant sent his wife a text message to "[d]elete this before we go to prison."
The defense's case-in-chief relied on the testimony of an emergency medicine physician, who testified that the victim's injuries were the possible result of the rescue efforts performed by first responders. He further described both CPR and the Heimlich maneuver as forms of blunt force trauma, but acknowledged on cross-examination that defendant's narrative of the victim falling out of the chair would not explain the victim's condition as documented in the medical records or photographs. For his part, defendant testified that he was a certified foster parent and had a clean record. He recounted that the victim and his brother liked to "tussle" with each other, sometimes escalating to a point where defendant had to split them up for [*6]going too hard. On the day of the incident, defendant testified that the victim fell from the chair and began to slur his words. He knew he should have called 911 first, but called his wife to "hurry up and get home" as he began to perform CPR and the Heimlich maneuver on the victim until first responders took over. When asked to explain the text messages, defendant testified he did not know what his wife was talking about when she mentioned the bruising, that his family had engaged in "prank wars" which were depicted in the videos of the water poured over the children's heads, and that he was just joking when he told her to delete the videos so they did not go to prison. Defendant denied that he abused the children, but did not deny certain allegations relating to the punishment and acknowledged that stomping on a child could seriously injure or kill a child.
Based on the foregoing, a different verdict may not have been unreasonable had the jury credited the defense expert and defendant's version of events, including that the victim had fallen from the toddler chair, was choking on food and that defendant immediately began to perform life-saving measures on the victim and summoned his wife to help. However, this presented the jury with a credibility determination and, when viewing the evidence in a neutral light and "weighing the relative probative force of the conflicting testimony and evidence, as well as the relative strength of the conflicting inferences to be drawn therefrom" (People v Sanchez, 32 NY3d at 1022 [internal quotation marks and citation omitted]), we find that the jury was justified in rejecting defendant's version of the events. The victim's injuries were not consistent with falling off an 11-inch-tall toddler chair or choking, but, according to the pathologist, were consistent with force similar to the magnitude of a high-speed vehicle accident. Notably, defendant's own medical expert agreed with the assessment that the injuries were not consistent with defendant's explanation of the events. The jury also heard testimony from the People's pathologist that resuscitation efforts did not cause the victim's injuries, as well as testimony from the victim's brother explaining that defendant stepped on the victim's stomach on the evening in question, which was corroborated by the medical proof documenting a severe injury in that area of the victim's body. On this record, the jury could conclude beyond a reasonable doubt that defendant was "the actor who . . . inflicted the [victim's fatal] injuries" and, accordingly, that the People established the actus reus requirement of Penal Law § 125.25 (4) (People v Hall, 182 AD3d 1023, 1027 [4th Dept 2020], lv denied 35 NY3d 1045 [2020]; see People v Warrington, 146 AD3d at 1237).
As for whether defendant acted with the requisite mens rea of depraved indifference to human life and recklessness as to a grave risk of serious physical injury or death (see People v Barboni, 21 NY3d at 400), the [*7]People presented extensive evidence portraying systematic physical and psychological abuse of the victim — who had a developmental disability — and his brother while in the custody of defendant and the wife before the date of the underlying incident. Moreover, the level of force required to inflict the victim's fatal injury reflected wanton cruelty and brutality in defendant's actions sufficient to demonstrate a grave risk of serious physical injury to the victim's naturally vulnerable condition (see People v Hall, 182 AD3d at 1026; People v Warrington, 146 AD3d at 1236; see also Assembly Sponsor's Letter in Support, Bill Jacket, L 1990, ch 477 at 10).[FN3] From this proof, the jury could find that defendant engaged in "a brutal, prolonged and ultimately fatal course of conduct against a particularly vulnerable victim" (People v Barboni, 21 NY3d at 403 [internal quotation marks and citation omitted]; see People v Nelligan, 135 AD3d at 1078). When considered in conjunction with defendant's failure to immediately summon medical care for the victim despite "know[ing] . . . how the injuries were inflicted" (People v Barboni, 21 NY3d at 402), his misleading of first responders in this regard, and his conduct and demeanor before and after the victim passed, we are satisfied that the jury's conclusion that defendant evinced a wanton and uncaring state of mind reflecting a callous indifference to the victim's life is supported by the weight of the evidence (see People v Hall, 182 AD3d at 1028; People v Warrington, 146 AD3d at 1237; People v Waite, 145 AD3d 1098, 1101-1102 [3d Dept 2016], lv denied 29 NY3d 953 [2017]; see also People v Wilson, 32 NY3d at 8; People v Barboni, 21 NY3d at 402; People v Ford, 43 AD3d 571, 572-573 [3d Dept 2007], lv denied 9 NY3d 1033 [2008]). Moreover, as a certified foster parent, defendant had been trained in proper disciplinary techniques and knew that any corporal punishment of the foster children in his care was forbidden (see 18 NYCRR 441.9 [c]), making his use of these techniques — such as stomping on the stomach of a child — particularly egregious and evincing a mens rea of "recklessness as to a grave risk of serious physical injury or death" (People v Barboni, 21 NY3d at 400).
Contrary to defendant's contentions, the fact that he began immediate life-saving measures on the victim and called his wife to summon medical aid does not dictate a different result. Rather "[t]he People were required to show that defendant had the necessary mens rea of callous indifference when the crime occurred, not at all times thereafter" (People v Waite, 145 AD3d at 1102; see People v Williams, 54 AD3d 599, 599 [1st Dept 2008] ["Defendant's attempts to revive the child and obtain help may have shown a lack of homicidal intent, but they did not undermine the jury's finding that he acted with depraved indifference at the time he inflicted the fatal injuries."], lv denied 11 NY3d 901 [2008]). Thus, where the defendant is the one who inflicted the [*8]fatal injuries, the sincerity and motivation behind post-injury rescue efforts distill to "implicated credibility questions for the jury to resolve" (People v Warrington, 146 AD3d at 1237 [internal quotation marks, brackets and citation omitted]; see People v Hall, 182 AD3d at 1028; see also People v Barboni, 21 NY3d at 402-403). We find no reason to disturb the jury's finding that defendant's "belated expressions of concern did not reflect any [genuine] interest in the victim's welfare" (People v Warrington, 146 AD3d at 1237). Accordingly, we find the jury's verdict as to murder in the second degree to be supported by the weight of the evidence. For similar reasons, the weight of the evidence also supports defendant's conviction for manslaughter in the first degree (see Penal Law § 125.20 [4]; People v Bridges, 220 AD3d 1107, 1111 [3d Dept 2023], lv denied 40 NY3d 1091 [2024]; People v Nelligan, 135 AD3d at 1076-1077; People v Beckingham, 57 AD3d 1098, 1098-1099 [3d Dept 2008], lv denied 13 NY3d 742 [2009]; People v Ford, 43 AD3d at 572-573).
Lastly, defendant argues that he must be resentenced because County Court exhibited bias toward him in its commentary prior to imposing sentence. To the extent that this issue is preserved despite defendant's failure to object to those comments at sentencing, it is apparent that County Court's remarks, while injudicious, did not reflect impermissible bias (see People v Brown, 192 AD3d 1260, 1262 [3d Dept 2021]; People v Ganoe, 122 AD3d 1003, 1003-1004 [3d Dept 2014], lv denied 25 NY3d 1163 [2015]; People v Darling, 276 AD2d 922, 924 [3d Dept 2000], lv denied 96 NY2d 733 [2001]). The record gives no reason at all to believe that County Court was biased toward defendant during the trial. What it does reflect is that County Court became disturbed by the total lack of remorse exhibited by defendant when he addressed the court during the sentencing proceeding and, in particular, his insisting that he was "not a murderer" and that the victim and his brother were "sons" to him who "gave [him] so much joy" — although testimony revealed that defendant was unable to provide the victim's date of birth when giving a statement to a detective. Despite making quite pointed and somewhat indecorous comments, County Court imposed sentences which, in view of the brutality of defendant's acts and his lack of remorse, were consistent with similar matters and, therefore, we cannot say that they were harsh or excessive in any respect (see People v Warrington, 146 AD3d at 1239; People v Jones, 139 AD3d 1189, 1191 [3d Dept 2016], lv denied 28 NY3d 932 [2016]; People v Nelligan, 135 AD3d at 1078). Defendant's remaining contentions have been examined and lack merit.
Clark, J.P., McShan and Mackey, JJ., concur.
Aarons, J. (dissenting in part).
Ask 12 random people on the street to describe the mental state of someone who stomps on a young child's stomach so hard that it kills him. Each will say something like, "cruel," "brutal," [*9]"monstrous" — maybe even "depraved" (see People v Lewie, 17 NY3d 348, 359 [2011]). The jurors here rationally arrived at the same conclusion — and, indeed, "the horrific nature of defendant's assault of the [victim] was clearly intended to be encompassed within the depraved indifference murder of a child statute" (People v Barboni, 21 NY3d 393, 403 [2013]).
But depravity is not enough. Depraved indifference to human life "is something even worse" (People v Lewie, 17 NY3d at 359). To prove this rare state of mind, there must be evidence of "wanton cruelty, brutality, or callousness, combined with an utter indifference as to whether the victim lives or dies" (People v Wilson, 32 NY3d 1, 6 [2018] [emphasis added]; see People v Maldonado, 24 NY3d 48, 53 [2014]). That combination is not present here. Consequently, defendant's conviction of depraved indifference murder must be reversed, and that count of the indictment dismissed.[FN4]
To sustain a conviction for depraved indifference murder, there must be "evidence evincing a defendant's utter disregard for human life" (People v Maldonado, 24 NY3d at 53). "Reflecting wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts, depraved indifference is embodied in conduct that is so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy as to render the actor as culpable as one whose conscious objective is to kill" (People v Suarez, 6 NY3d 202, 214 [2005] [internal quotation marks and citation omitted; emphasis added]; accord People v Williams, 206 AD3d 1282, 1284 [3d Dept 2022]). "Quintessential examples are firing into a crowd; driving an automobile along a crowded sidewalk at high speed; opening the lion's cage at the zoo; placing a time bomb in a public place; poisoning a well from which people are accustomed to draw water; opening a drawbridge as a train is about to pass over it and dropping stones from an overpass onto a busy highway" (People v Suarez, 6 NY3d at 214 [internal citations omitted]). In these cases where bystanders are endangered by the alleged conduct, the breadth of the grave risk supplies an inference that the defendant did not care about any of the human lives in harm's way, including the victim's (see e.g. People v Dorvil, 234 AD3d 1106, 1111-1112 [3d Dept 2025], lv denied 44 NY3d 982 [2025]; People v Potomont, 225 AD3d 789, 790 [2d Dept 2024], lv denied 42 NY3d 929 [2024]; People v Maeweather, 172 AD3d 1646, 1648 [3d Dept 2019], lv denied 34 NY3d 1017 [2019]; cf. People v Baldner, 230 AD3d 1434, 1440 [3d Dept 2024], affd 44 NY3d 999 [2025]). That inference cannot arise in the same way where, as here, the alleged gravely risky conduct is directed at a single person. And indeed, "[d]epraved indifference is ordinarily not present in one-on-one killings where only a single person is endangered" (People v Manos, 73 AD3d 1333, 1334 [3d Dept 2010], lv denied 15 NY3d 807 [2010]).
In light of this limitation[*10], two recurring factual scenarios have been held to support a depraved indifference finding in cases involving a targeted victim (see People v Barboni, 21 NY3d at 403; People v Suarez, 6 NY3d at 213). The first "occurs when the defendant intends neither to seriously injure, nor to kill, but nevertheless abandons a helpless and vulnerable victim in circumstances where the victim is highly likely to die" (People v Wilson, 32 NY3d at 9 [internal quotation marks and citation omitted]). That one is not applicable, as the trial evidence demonstrated defendant never abandoned the victim.
The second scenario occurs "when a defendant — acting with a conscious objective not to kill but to harm — engages in torture or a brutal, prolonged and ultimately fatal course of conduct against a particularly vulnerable victim" (People v Suarez, 6 NY3d at 212; accord People v Wilson, 32 NY3d at 9). This is because the "defendant's actions serve to intensify or prolong a victim's suffering," and thus "bespeak a level of cruelty that establishes the depravity mandated by statute" (People v Suarez, 6 NY3d at 212-213). More relevant here, this second scenario supports an inference of callous indifference to human life because "the [defendant] had the opportunity to regret his actions and display caring, but failed to take the opportunity" (People v Barboni, 21 NY3d at 403). The second scenario also does not apply here (compare People v Bohn, 242 AD3d 1357, 1364-1365 [3d Dept 2025]; People v Nelligan, 135 AD3d 1075, 1077 [3d Dept 2016], lv denied 27 NY3d 1072 [2016]).
To be sure, those two scenarios — abandonment or prolonged brutality — do not define the universe of one-on-one depraved indifference crimes (see People v Barboni, 21 NY3d at 403 & n 1; see e.g. People v Jeffries, 56 AD3d 1166, 1166-1167 [4th Dept 2008], lv denied 12 NY3d 759 [2009]). So long as the credible proof permits a jury to find an utter disregard for human life beyond a reasonable doubt, a conviction for depraved indifference murder will be sustained (see People v Barboni, 21 NY3d at 403). The weight of the evidence does not justify such a finding in this case.[FN5]
Start with the stomp itself — an act of extraordinary recklessness and cruel violence, especially given the victim's vulnerability as a four-year-old foster child in defendant's care. The shocking ferocity of that conduct cannot be denied, and the jury was right to consider it in assessing defendant's mental state. But "[t]he element of depraved indifference to human life comprises both depravity and indifference, and has meaning independent of recklessness and the gravity of the risk created" (People v Maldonado, 24 NY3d at 53 [internal quotation marks and citation omitted; emphasis added]). Thus, the moral repugnance embodied by defendant's brutal conduct is necessary but not sufficient to establish depraved indifference to human life (cf. People v Suarez, 6 NY3d at 214). Further, defendant's choice to stomp on the victim as a manner of corporal [*11]punishment despite knowing the risk to the victim's life, combined with actually stomping on the victim, satisfied the People's burden to prove that "defendant recklessly engage[d] in conduct which create[d] a grave risk of serious physical injury or death" (Penal Law § 125.25 [4]). To simultaneously find that the stomp alone also satisfied the element of depraved indifference is to impermissibly collapse that element into recklessness and the gravity of the risk (see e.g. majority op at 8).
Further, this cannot be one of the "rare[ ]" cases in which the culpable mental state "of depraved indifference [is] established by risky behavior alone" (People v Maldonado, 24 NY3d at 53). Having also found defendant guilty of first-degree manslaughter, the jury necessarily concluded beyond a reasonable doubt that defendant stomped on the victim's stomach "with intent to cause physical injury" (Penal Law § 125.20 [4]). On the other hand, depraved indifference to human life is "best understood as . . . a willingness to act not because one intends harm, but because one simply does not care whether grievous harm results or not" (People v Williams, 206 AD3d at 1284 [internal quotation marks, brackets and citations omitted]; see People v Maldonado, 24 NY3d at 52-53). Although convictions for first-degree manslaughter and depraved indifference murder are not incompatible as a matter of law (see People v Baker, 14 NY3d 266, 272 [2010]), "a defendant who intends to injure . . . a particular person cannot generally be said to be indifferent — depravedly or otherwise — to the fate of that person" (People v Suarez, 6 NY3d at 211 [internal quotation marks and citation omitted]). Thus, to reject that strong inference and find an utter indifference to human life in this case, the jury needed to look beyond the stomp for evidence showing that he considered the victim's life irrelevant.
So, turn to the immediate circumstances surrounding the stomp. The disciplinary sequence that preceded it — the cold shower, the "nasty corn," the wall sit in response to the victim's accident on defendant's couch — does not reasonably imply that defendant did not care whether the victim would ever again "Get up!" after the fatal blow (see People v Matos, 19 NY3d 470, 476-477 [2012]; see also People v Bussey, 19 NY3d 231, 236 [2012]). Further, the People's pathologist testified that the victim would have fallen unconscious and died within four to five minutes of being struck in the abdomen — consistent with the eyewitness account of the victim's brother. The pathologist also indicated that the victim's internal injuries were medically nonsurvivable regardless of how quickly help arrived. But defendant still called his wife twice within a few minutes; the wife called 911 three minutes later to report the victim was not breathing; and defendant performed CPR on the victim until first responders arrived minutes after that. Paramedics confirmed on arrival that the victim was not breathing and [*12]that his heart was not beating either. As they worked to revive the victim without success, defendant sat off to the side, apparently upset and praying (compare People v Johnson, 127 AD3d 451, 451-452 [1st Dept 2015], lv denied 26 NY3d 1009 [2015], cert denied 578 US 929 [2016]; People v Baker, 58 AD3d 1069, 1071 [3d Dept 2009], affd 14 NY3d 266 [2010]; People v Jamison, 45 AD3d 1438, 1439-1440 [4th Dept 2007], lv denied 10 NY3d 766 [2008]). This evidence is inconsistent with an inhumane ambivalence to the plight of a vulnerable victim (see People v Matos, 19 NY3d at 476-477; compare People v Barboni, 21 NY3d at 397; People v Hall, 182 AD3d 1023, 1027-1028 [4th Dept 2020], lv denied 35 NY3d 1045 [2020]; People v Warrington, 146 AD3d 1233, 1237 [3d Dept 2017], lv denied 29 NY3d 1038 [2017]; People v Griffin, 48 AD3d 1233, 1235 [4th Dept 2008], lv denied 10 NY3d 840 [2008]; see also People v Bohn, 242 AD3d at 1364).
Of course, the jury was free to find defendant's efforts and "expressions of concern did not reflect any interest in the victim's welfare" (People v Warrington, 146 AD3d at 1237; see also People v Bohn, 242 AD3d at 1366-1367). But they could not stretch that finding to infer defendant's specific mental state. Attempting after the fact to cover up a crime — for example, performing CPR on the lifeless victim, lying about the true cause of the victim's fatal injury or belatedly displaying compassion — implies consciousness of guilt, not depraved indifference (see People v Matos, 19 NY3d at 476-477; see generally People v Bennett, 79 NY2d 464, 470 [1992]).
As to defendant's demeanor, any inference of depraved indifference that could be drawn from defendant's conversation with the officer at the scene fails. According to the officer, the victim had already been taken to the hospital, and defendant had already given his statement. Defendant asked the officer about the victim's condition, and he spoke about his children in a "laid-back" manner only when one of them wandered into the room. And defendant did not offer up his musical interests out of the blue; the officer asked about them, and defendant answered. Even if an inference of callous disregard for the victim's life or death could be drawn from defendant's small talk with the officer — and it manifestly cannot — it would be vastly weaker than the innocent description the officer gave the jury: a way to fill the "awkward silence" between them until a detective arrived (see generally People v Bleakley, 69 NY2d 490, 495 [1987]).
Next, the caseworker who interviewed the victim's brother and defendant's children reported that defendant appeared "[j]ovial" several hours after the victim's death, "skipping" away from the caseworker after she told him that the victim's brother and his own children would not be going home with him and his wife that night. Critically, however, defendant knew before that point in time that the victim had died. Therefore, using this evidence to infer indifference [*13]to the victim's survival is irrational. Instead, viewing the evidence as the thirteenth member of this jury (see People v Taft, 145 AD3d 1090, 1091 [3d Dept 2016], lv denied 29 NY3d 953 [2017]; see generally People v Bleakley, 69 NY2d at 495), the strongest inferences of guilt available from the caseworker's testimony are that defendant's inappropriate affect reflected an intent to cause death (not consistent with depraved indifference murder), a guilty mind (not a specific culpable mental state), or both.
Now, look back in time. The People relied on the bruising documented on the victim, the cancellation of certain caseworker visits, and a video of the victim in time-out. But none of that evidence is probative of whether defendant acted with an utter disregard for whether the victim lived or died. As to the bruising, together with the testimony of the victim's brother, the People's expert and other evidence,[FN6] the jury could reasonably infer that defendant physically abused the victim during the foster placement. However, no evidence showed defendant had previously inflicted potentially lethal corporal punishment so as to suggest depraved indifference. Moreover, it was defendant's wife — not defendant — who canceled the caseworker visits, a fact that, at most, could support an inference of an attempt to cover up evidence of abuse, which is not probative of depraved indifference (see People v Lewie, 17 NY3d at 359).
And the time-out video shows defendant poured a small amount of water from a plastic bottle onto the victim as he dozed in a child-sized chair, giggles from other children audible in the background, with no suggestion of the grossly inhumane mental state required for defendant's murder conviction. True, the jury was not obliged to accept defendant's innocent explanation that his conduct was a prank, but that does not change what the video depicts. And because the video does not show brutal, wanton or even criminal conduct, it is preposterous to interpret it together with defendant's text to his wife — "[d]elete [the video] before we go to prison" — as evidence of depraved indifference (see generally People v Bennett, 79 NY2d at 470).[FN7]
Likewise, the testimony of the victim's brother — that defendant hurt and did "the same things" to him, like "step[ ]" on his stomach — is not probative of callous indifference to the victim's fate. The brother did not testify, nor did the other evidence reveal, that defendant applied comparable force to the brother's stomach. That is to say, the brother's account would not have permitted the jury to infer that defendant stomped on his stomach, saw him suffer and chose to repeat that brutality against the victim with tragic consequences (cf. People v Barboni, 21 NY3d at 402; People v Suarez, 6 NY3d at 213).
Nor did the People show a "brutal, prolonged and ultimately fatal course of conduct," contrary to the majority's conclusion (People v Suarez, 6 NY3d at 212). To find defendant guilty of depraved indifference [*14]murder under this theory, the proof must allow an inference that the culpable mental state permeated a set of brutal acts and wanton omissions, including — but not isolated to — the cause of the victim's death (see e.g. People v Stahli, 159 AD3d 1055, 1056-1057 [3d Dept 2018], lv denied 31 NY3d 1088 [2018]; People v Nelligan, 135 AD3d at 1076-1078; see also People v Bohn, 242 AD3d at 1365; cf. People v Bauman, 12 NY3d 152, 155 [2009]). In other words, the alleged course of conduct must evince depraved indifference in order for the jury to attribute that mental state to the final fatal act (see People v Barboni, 21 NY3d at 403).
Here, viewing the evidence in a neutral light and according great deference to the jury's "opportunity to view the witnesses, hear the testimony and observe demeanor" (People v Bleakley, 69 NY2d at 495), the People proved the victim experienced episodes of non-life-threatening physical abuse at unspecified points in time while in defendant's care, and a single act of brutality that irretrievably caused the victim to die within minutes (compare People v Wilson, 32 NY3d at 7). The jury may have viewed the fatal stomp as the culmination of earlier abuse and inferred defendant had prior opportunities to reconsider his conduct and display caring (cf. id.). But the medical evidence demonstrated that the earlier abuse did not cause or contribute to the victim's death. Thus, neither the specific history of physical abuse proved at trial nor defendant's failure to desist from that conduct supplies an inference of an utter disregard for the victim's life (see People v Barboni, 21 NY3d at 403; cf. People v Williams, 206 AD3d at 1288).
The majority gets a different result by using a rule custom-made for this case. According to the majority, depraved indifference may be found "where the [defendant] subjected the [vulnerable] victim to a 'prolonged period of' abuse leading up to the final fatal assault and failed to obtain medical care" (majority op at 4 [emphasis added]; quoting People v Wilson, 32 NY3d at 7).[FN8] Yet the majority fails to articulate how that weakened rule yields an inference of "wanton cruelty, brutality, or callousness, . . . combined with utter indifference" as to whether the victim lives or dies (People v Suarez, 6 NY3d at 213). The cases the majority cites do not justify lowering the second scenario's standard of "torture or a brutal, prolonged and ultimately fatal course of conduct" to any kind of physical abuse preceding the cause of death (People v Suarez, 6 NY3d at 212). Nor do the majority's cases explain why murder liability should turn on an immediate decision to call anyone else before 911 regardless of the victim's condition. Quite the contrary: each affirmed conviction in the majority's cases rests on proof of sustained brutality, an extended failure to summon any aid to a suffering victim with profound injuries, or both (see People v Wilson, 32 NY3d at 6; People v Barboni, 21 NY3d at 403; People v Warrington[*15], 146 AD3d at 1236-1237; People v Nelligan, 135 AD3d at 1076-1078; see also People v Wilson, 147 AD3d 793, 793 [2d Dept 2017], affd 32 NY3d 1 [2018]; People v Barboni, 90 AD3d 1548, 1549 [4th Dept 2011], affd 21 NY3d 393 [2013]; People v Varmette, 70 AD3d 1167, 1169-1170 [3d Dept 2010], lv denied 14 NY3d 845 [2010]; People v Heslop, 48 NY3d 190, 192-193 [3d Dept 2007], lv denied 10 NY3d 935 [2008]; People v Jamison, 45 AD3d at 1439-1440; People v Ford, 43 AD3d 571, 573-574 [3d Dept 2007], lv denied 9 NY3d 1033 [2008]). And in one case, the conviction was reversed for insufficient evidence of depraved indifference where the defendant attempted to treat the severe burns covering 12% of her 20-month-old foster child's body, concealed the child's injuries and waited two weeks to obtain medical care (see People v Verneus, 184 AD3d 678, 681-683 [2d Dept 2020]; id. at 687-690 [Roman, J., dissenting]). In any event, our task is to weigh the evidence "in light of the elements as charged to the jury without objection by defendant" (People v Snyder, 91 AD3d 1206, 1212 [3d Dept 2012] [internal quotation marks and citation omitted], lv denied 19 NY3d 968 [2012]; cert denied 568 US 1070 [2012]). And here, County Court did not instruct the jury on the majority's rule for finding depraved indifference or anything close to it, so that rule cannot control.
Moreover, our deference to the jury's ability to choose among competing inferences applies only when the chosen inference is not unreasonable (see People v Fisher, 221 AD3d 1355, 1359 [3d Dept 2023], lv denied 40 NY3d 1092 [2024]; People v Cook, 206 AD3d 1236, 1237-1238 [3d Dept 2022]). Despite acknowledging a different verdict was possible in this highly fact-specific case, the majority's weight-of-the-evidence analysis recites the credible evidence without interrogating whether it actually permits a reasonable inference of an "utter disregard for human life," and without assessing the relative strength of the conflicting inference that flows from proof that defendant intended to cause a non-life-threatening physical injury — for example, defendant's instruction to the victim to get up after the stomp (People v Maldonado, 24 NY3d at 53; see Penal Law §§ 10.00 [9]; 120.25 [4]; see generally People v Bleakley, 69 NY2d at 495). Instead, the majority uncritically accepts the most strained interpretations of the proof, treats evidence of grossly deficient foster parenting as dispositive, and relies on the accumulation of guilty-mind evidence to find that defendant possessed the specific, heightened and rare culpable mental state of depraved indifference to human life. As a result, the majority credits a narrative of an utter disregard for the victim's life or death that, for all the reasons above, does not hold up under the "neutral light" our weight-of-the-evidence review requires us to shine on it (People v Bohn, 242 AD3d at 1366).
Still, by affirming this conviction on this record, the majority risks elevating every [*16]reckless killing of a child in an abusive household to second-degree murder (see Penal Law § 125.25 [4]). If that was the Legislature's intent, it would have written the statute to say so (see People v Matos, 19 NY3d at 477; cf. Penal Law § 125.25 [3] [felony murder]; see generally People v Manos, 73 AD3d at 1338).[FN9] And while the weight of the evidence in this case demonstrates defendant cared "much too little" about the victim's safety, it does not support a reasonable inference that he "did not care at all" (People v Matos, 19 NY3d at 476 [internal quotation marks and citation omitted]). Therefore, I must respectfully dissent.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: The mesentery is the tissue connecting "the intestines and their appendages . . . [to] the dorsal wall of the abdominal cavity" (Merriam-Webster Online Dictionary, mesentery [https://www.merriam-webster.com/dictionary/mesentery]).

Footnote 2: In seeking to redress situations where juries refused to believe that a parent or guardian intended to create a grave risk of death to a child (compare Penal Law § 125.25 [2]), the Legislature enacted subdivision (4) of Penal Law § 125.25 with a reduced intent element in child homicide cases which "appropriately makes child abusers responsible for the consequential results of the acts which they should have known could occur by virtue of the child's naturally vulnerable condition" (Assembly Sponsor's Letter in Support, Bill Jacket, L 1990, ch 477 at 9-10; see People v Heslop, 48 AD3d 190, 195 [3d Dept 2007], lv denied 10 NY3d 935 [2008]; People v Ford, 43 AD3d 571, 573 [3d Dept 2007], lv denied 9 NY3d 1033 [2008]).

Footnote 3: This remains true even where the fatal blow is inflicted in a single, violent outburst (see People v Jamison, 45 AD3d 1438, 1439-1440 [4th Dept 2007] [striking the victim with such force to cause, like here, significant lacerations to the liver and tearing of the tissues around the intestines], lv denied 10 NY3d 766 [2008]; People v Ford, 43 AD3d at 572-574 [striking the victim in the stomach with such force to cause a liver laceration and internal bleeding]; see also People v Varmette, 70 AD3d 1167, 1171 [3d Dept 2010], lv denied 14 NY3d 845 [2010]).

Footnote 4: I join the majority's conclusion that the proof on this record satisfied the remaining elements of depraved indifference murder of a child and manslaughter in the first degree (see Penal Law §§ 125.20 [4]; 125.25 [4]). That said, in light of my analysis and conclusion, County Court's insistence at sentencing that defendant is a "murderer" and a "sociopath" based upon "overwhelming" proof, along with the court's refusal to impose the correct sentence on the two misdemeanor counts (because the incorrect one would be remedied by operation of law) transcend "injudicious" to prejudice (majority op at 9). As such, I would vacate the sentence and remit for resentencing before a different judge.

Footnote 5: In a weight of the evidence analysis, "where a different verdict would not have been unreasonable, we view the evidence in a neutral light and, according deference to the jury's credibility determinations, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Snyder, 91 AD3d 1206, 1212 [3d Dept 2012] [internal quotation marks and citations omitted], lv denied 19 NY3d 968 [2012]; cert denied 568 US 1070 [2012]). Like the majority, my analysis assumes the jury credited the People's witnesses and rejected defendant's account.

Footnote 6: The victim's brother testified that defendant caused bruises on his chest when defendant grabbed him "very hard." Together with the other evidence, including the wife's text message — no more bruises, we need them to heal — the jury could reasonably infer that defendant abused the victim.
Footnote 7: In a similar vein, the majority's assertion that "[defendant] may have even enjoyed tormenting" the children is self-evidently speculative, finding no support in the ambiguous conduct the majority cites (majority op at 6).

Footnote 8: In People v Wilson (32 NY3d at 7), the "prolonged period of domestic abuse" was a euphemism for a "protracted continuous injury pattern [sustained] over [two] months," consisting of "scarring, bruising, a dislocated shoulder, a collapsed lung, a broken breastbone, broken ribs, and permanent brain damage" that would have killed the victim within hours had help not arrived when it did. The defendant's depraved indifference assault conviction was upheld because a callous indifference to human life could be found in defendant's two-month failure to take any one of the "multiple opportunities to regret his actions and display caring" by seeking medical attention for his "gravely-injured, brain-damaged victim" (id. [internal quotation marks and citation omitted]; see Penal Law § 120.10 [3]). Similar facts could not have been found by the jury in this case.

Footnote 9: As the majority notes (majority op at 3 n 2), Penal Law § 125.25 (4) — the depraved indifference murder of a child statute — was enacted in 1990 as part of a package of new crimes with enhanced penalties for child abuse. Before 1990, first-degree manslaughter and felony assault required proof that an abusive parent or guardian intended to cause serious physical injury — a finding juries were often reluctant to make. To address that problem, the Legislature created new first-degree manslaughter and second-degree assault offenses allowing liability where the defendant intended only physical injury and either recklessly caused serious physical injury or created a risk of serious physical injury and death resulted (see Penal Law §§ 120.05 [8]; 125.20 [4]; Assembly Mem in Support, Bill Jacket, L 1990, ch 477 at 6-7; compare Penal Law § 10.00 [9] [physical injury], with Penal Law § 10.00 [10] [serious physical injury]). Unlike those new intent-based crimes, Penal Law § 125.25 (4) imposes murder liability without proof of intent to injure, expanding liability to reckless conduct creating a grave risk of serious physical injury to a child — not only a grave risk of death — under circumstances evincing depraved indifference to human life (see People v Heslop, 48 AD3d at 195; Assembly Sponsor's Letter, Bill Jacket, L 1990, ch 477 at 10; compare Penal Law § 125.25 [2]; see generally Penal Law §§ 15.00 [4], [6]; 15.05 [1], [3]; 15.15 [1]). In short, the Legislature reduced the People's burden on the risk element of the murder charge in recognition of a child's inherent vulnerability without altering the People's burden on the separate element of depraved indifference to human life. In affirming defendant's depraved indifference murder conviction on the record in this case, the majority blurs the distinction between that crime and first-degree manslaughter.